GAUTAM DUTTA (State Bar No. 199326)
BUSINESS, ENERGY, AND ELECTION LAW, PC
1017 El Camino Real # 504
Redwood City, CA  94063
Telephone:  415.236.2048
Email:  Dutta@BEELawFirm.com
Fax:  213.405.2416

Attorneys for Plaintiffs
DONALD BLANKENSHIP and DENISE PURSCHE

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DONALD BLANKENSHIP and DENISE PURSCHE<br><br>*Plaintiffs*,<br><br>vs.<br><br>GAVIN NEWSOM, in only his official capacity as Governor of California; and ALEX PADILLA, in only his official capacity as Secretary of State of California;<br><br>*Defendants*. | CASE NO.<br><br>**PLAINTIFFS DONALD BLANKENSHIP AND DENISE PURSCHE'S MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION**<br><br>JUDGE: |

Plaintiffs Donald Blankenship and Denise Pursche hereby request, pursuant to FRCP 65, that the Court (1) issue a temporary restraining order (TRO) prohibiting enforcement of California's filing deadline and signature requirements for Presidential candidates for California's Nov. 3, 2020 general election, as well as any substitute requirements that Defendants may subsequently adopt or promote that violate Plaintiffs' constitutional rights; (2) issue a TRO prohibiting Defendants Governor Gavin Newsom and Secretary of State Alex Padilla from printing the Nov. 3, 2020 Presidential ballot unless they agree to extend the statutory filing deadline and decrease the signature requirement to an achievable number in light of the COVID-19 public-health emergency; and (3) issue an Order to Show Cause why a preliminary injunction

should not issue.

This Motion is based on the accompanying Memorandum of Points and Authorities, the Declarations of Donald Blankenship, Denise Pursche, Richard Winger and Gautam Dutta, the papers, records, and pleadings (including the Complaint) on file in this case, and any oral argument allowed by the Court.

Plaintiffs' counsel Gautam Dutta apprised, via telephone, the Governor's Office and the Secretary of State's Office of this Motion this morning (July 7, 2020).

Specifically, at approximately 8:20 am today, Ted Muhlhauser of the Secretary of State's Legislative Affairs Office (916 653 6774) advised Mr. Dutta to email the Complaint and all moving papers to ConstituentAffairs@sos.ca.gov.  Mr. Dutta will email those papers to that address at approximately 10:10 am today.

Mr. Dutta experienced difficulty in reaching anyone in the Governor's staff (including his Legal Affairs Secretary's Office), but was finally able to speak with Marilyn Nishikawa of the Governor's Office (916 445 2864) at approximately 9:30 am this morning.  After being apprised that this Motion would be filed, Ms. Nishikawa stated that she would have the appropriate person on the Governor's staff contact Mr. Dutta.

As of 10 am today, no one from the Governor's Office had contacted Mr. Dutta. Accordingly, Mr. Dutta will email the Complaint and all moving papers at approximately 10:10 am today to the following individuals:  the Governor's email (gov@gov.ca.gov), Ms. Nishikawa (Marilyn.Nishikawa@gov.ca.gov), the Governor's Legal Affairs Secretary Catherine Lhamon (Catherine.Lhamon@gov.ca.gov).

After the Summons has been issued, Plaintiffs will personally serve it upon Defendants.

DATED: July 7, 2020

BUSINESS, ENERGY, AND ELECTION LAW, PC

By: /s/ Gautam Dutta

GAUTAM DUTTA, ESQ.

Attorneys for Plaintiffs

DONALD BLANKENSHIP and

DENISE PURSCHE

MEMORANDUM OF POINTS AND AUTHORITIES

*There are few greater burdens that can be placed on a political [candidate] than being <u>denied access</u> to the ballot.*

-- Sixth Circuit, *Libertarian Party of Ohio v. Blackwell*[1]

## I.   Introduction

Unless the Court issues a temporary restraining order (TRO) and preliminary injunction enjoining California's statutory requirement that independent Presidential candidates collect nearly **200,000** signatures by **Aug. 7, 2020,** Presidential candidate Donald Blankenship and voters like Denise Pursche who seek to support him will immediately suffer irreparable harm.  Simply put, during the COVID-19 public-health emergency, it is virtually *impossible* to collect anywhere close to 200,000 *in-person* (i.e., non-electronic) signatures.

As we will show, California's ballot-access laws are unconstitutional, as applied, under the present COVID-19 public health emergency – during which nearly *3 million U.S. cases* had been reported and *130,000 Americans had died* as of July 5, 2020.[2] Because Plaintiffs meet the traditional and "serious questions" tests for obtaining a TRO, they implore the Court to swiftly issue a TRO and an Order to Show Cause why a preliminary injunction should not issue.

## II.   Background[3]

### A.   The Parties

Plaintiff **Donald Blankenship** was nominated by the Constitution Party at its May 2, 2020 virtual Convention as its candidate for the United States President.

Plaintiff **Denise Pursche,** a resident and registered voter in Contra County County, seeks

---

[1]   *Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 593 (6th Cir. 2006) (underlining added).
[2]   Centers for Disease Prevention and Control Update (July 5, 2020), *reproduced at* Dutta Decl. Exh. A.
[3]   All factual details derive from the accompanying Declarations of Donald Blankenship, Denise Pursche, national ballot-access expert Richard Winger, and Gautam Dutta.

- 4 -                                                                                      TRO MOTION

to vote for Mr. Blankenship in the 2020 presidential election.

Defendant **Gavin Newsom** is the Governor of California. Defendant Newsom has authority over the enforcement of the California Elections Code during a state of emergency.

Defendant **Alex Padilla** is the Secretary of State of California. Pursuant to Elections Code §12172.5, Secretary Padilla is the State's chief elections official and has ultimate authority over the enforcement of the California Elections Code, including the provisions challenged in this lawsuit.

B.     Introduction to Donald Blankenship

On Oct. 31, 2019, Mr. Blankenship filed, with the Federal Election Commission (FEC), his statement of candidacy for President of the United States. In California, Mr. Blankenship seeks to appear on the upcoming Nov. 3, 2020 Presidential ballot as an independent nominee. Two years ago, Mr. Blankenship ran for United States Senator from West Virginia.

*Constitution Party*. Mr. Blankenship is a Member of the Constitution Party, which is recognized by the FEC as a national party. The predecessor to the Constitution Party (the U.S. Taxpayers Party) was founded in 1992, and was recognized by the FEC as a national party in 1999. In 1999, the U.S. Taxpayers Party changed its name to the Constitution Party to better reflect the party's primary focus of returning government to the United States Constitution's provisions and limitations.

On May 2, 2020, Mr. Blankenship was named the Constitution Party's nominee for President of the United States at the Constitution Party's virtual 2020 Convention (the "Convention"). At the Convention, William Mohr was named the Constitution Party's nominee for Vice President of the United States. The Convention was attended by delegates from 26 states, including California, Washington, New York, West Virginia, and Arizona.

On October 31, 2019, Mr. Blankenship filed his Statement of Candidacy with the Federal Election Commission ("FEC").

Only California ballot-qualified political parties are permitted to gain access to the

California Presidential ballot.[4]  Currently, California's ballot-qualified political parties are comprised of, in alphabetical order, (1) American Independent Party, (2) Democratic Party, (3) Green Party, (4) Libertarian Party, (5) Peace and Freedom Party, and (6) Republican Party.

Because the Constitution Party is not a ballot-qualified party in California, the Constitution Party is not permitted to gain access to the California Presidential ballot for its Presidential nominee.  Throughout U.S. history, the presidential nominees of non-ballot-qualified parties have frequently used the independent candidate procedures instead of the new party procedures, if the independent procedure were easier.

The reverse is also true.  Namely, independent presidential candidates have sometimes formed new parties within just a single state, if the new party procedure in that state was easier than the independent procedure.  For example, John Anderson created the Independent Party in North Carolina in 1980, because North Carolina required 10,000 signatures for new parties but 166,383 signatures for statewide independent candidates.  The efforts of the Constitution Party's Presidential nominee to obtain ballot status in California as an independent in 2020 is entirely consistent with this historical practice.

Historically, given a signature-gathering requirement of 5,000 or more, the number of independent and minor-party presidential candidates has only once exceeded six[5] – a number that Justice Harlan indicated would carry no risk of voter confusion in his concurrence in *Williams v. Rhodes*.[6]  Since a signature requirement of no more than 5,000 could achieve the state's purported interest in avoiding ballot clutter, a signature requirement of nearly 200,000 looms as disproportionate, excessive, and unreasonable in the wake of the COVID-19 pandemic.

C.  California's Ballot-Access Requirements for Independent Presidential Candidates

---

[4]  Cal. Elections Code §338.
[5]  In 1984, Ohio had 7 independent and minor-party Presidential candidates.  Winger Decl. ¶12 & n.1
[6]  *Williams v. Rhodes*, 393 U.S. 23, 46-47 (1968) ("Ohio law would permit as many as six additional party candidates to compete with the Democrats and Republicans . . . And with fundamental freedoms at stake, such an unlikely hypothesis cannot support an incursion upon protected rights, especially since the presence of eight candidacies cannot be said, in light of experience, to carry a significant danger of voter confusion.")

In California, an independent Presidential nominee must collect **196,964** signatures from registered voters between Apr. 24, 2020 and **Aug. 7, 2020.**[7] To obtain signatures for an independent Presidential candidate's nomination papers (the "Nomination Papers"), one must personally approach known or potential voters and ask them to support his or her effort to appear on the Presidential ballot. California law requires "wet" signatures. That is, the physical Nomination Papers must be signed *in person*, and are *not* allowed to be signed electronically.

Before shelter-in-place orders were issued in California in Mar. 2020, Mr. Blankenship had planned to collect over 200,000 signatures by using a combination of volunteers and paid signature gatherers.

### D. The COVID-19 Public Health Emergency

In Dec. 2019, an outbreak of respiratory disease caused by a novel coronavirus emerged in China. The respiratory disease caused by the novel coronavirus, now known as "COVID-19", is an infectious disease that can spread from person to person and can result in serious illness and death. On January 30, 2020, after the coronavirus outbreak had spread well beyond China, the World Health Organization declared that COVID-19 constitutes a Public Health Emergency of International Concern.

On January 31, 2020, as a result of confirmed cases of COVID-19 in the United States, Health and Human Services Secretary Alex M. Azar II declared a nationwide public health emergency retroactive to January 27, 2020.

On February 27, 2020, the Centers for Disease Control and Prevention ("CDC") issued guidance recommending, among other things, that members of the public practice "social distancing" and minimize close contact with others in order to slow the spread of COVID-19. On March 11, 2020, the World Health Organization declared COVID-19 to be a global

---

[7] Namely, 196,964 equals 1 percent of the registered voters immediately prior to the 2018 general election; and Apr. 24, 2020 and Aug. 7, 2020 are the 193rd day and 88th day, respectively, before the Nov. 3, 2020. *See* Cal. Elections Code §§8403, 8400. *See also* Cal. Secretary of State's summary of requirements for independent Presidential candidates, *attached as* Dutta Decl. Exh. B.

pandemic.

On Mar. 19, 2020, in response to the unprecedented COVID-19 pandemic, Defendant Newsom issued Executive Order N-33-20 (the "Stay-at-Home Order", *attached as* Dutta Dec. Exh. E), which directed all Californians to stay home except those who held essential jobs ("Essential Workers") or to shop for essential needs. The Stay-at-Home Order further required that Essential Workers who leave their homes must maintain social distancing standards by remaining at least *six feet apart* from others.

Under the Stay-at-Home Order, public professional, social, and community mass gatherings are prohibited. It is unclear whether the Stay-at-Home Order provides an exception for a candidate's signature-gathering activities.

On Mar. 20, 2020, Defendant Newsom issued Executive Order N-34-20 (*attached as* Dutta Dec. Exh. D), which acknowledged the danger posed by coronavirus to voting rights – declaring that the virus will "impair the ability of relevant state and local officials, including county elections officials and the Secretary of State, and the volunteers supporting them, to meet statutory deadlines associated with these responsibilities."

In relevant part, the Mar. 20, 2020 Order stated that "in-person voting presents risks to public health and safety in light of the COVID-19 pandemic, and could risk *undermining social distancing measures* imposed by the State Public Health Officer[.]"[8] To ensure that California elections remain "accessible, secure, and safe", the Mar. 20, 2020 Order mandated that voters across California be given the option to vote by mail, *without having to cast their votes in person*.

Mr. Blankenship and Ms. Pursche understand that California's statutory requirement that Mr. Blankenship gather at least 196,964 "wet" signatures to qualify for the Presidential ballot *remains in effect*.

E. <u>Impossibility of Gathering Signatures in the Wake of the COVID-19 Pandemic</u>

---

[8] Dutta Decl. Exh. D (italics added).

The combination of the COVID-19 pandemic and the Governor's Stay-at-Home Order has rendered it virtually *impossible* for Presidential candidates like Mr. Blankenship to obtain nearly 200,000 signatures by August 7, 2020, California's statutory deadline. In the wake of the COVID-19 pandemic, it is neither safe nor advisable to circulate any Nomination Papers.

Gathering signatures is a time-consuming process, which requires close contact with voters across California. It involves going to places where the public congregates. Many businesses remain closed and all large, and public mass gatherings are still prohibited. Additionally, because of public-health concerns, voters at large are reluctant not only to attend public gatherings, but to speak with signature gatherers.

Furthermore, gathering signatures for a candidate requires coming into close contact with individual voters – generally *closer than six feet* – to hand them a copy of information about a candidate to review, answer questions, instruct the voter where to sign, and properly witness the voter signature. Indeed, the very *act* of signature-gathering poses a risk of infection, for one can carry and spread COVID-19 without showing any outward symptoms. Moreover, because it is not clear how long the virus can survive on various surfaces, the act of touching a pen, a clipboard, or a piece of paper that has recently been touched by another person *also* poses a risk of infection.

Because signature-gathering requires approaching people closer than six feet, it is unlikely that gathering signatures would be lawful – because it would not comply with the Stay-at-Home Order's six-foot mandate. Even if signature-gathering would not violate the Stay-at-Home Order, Mr. Blankenship is not willing to have Ms. Pursche or anyone else engage in an activity (here, approaching known or potential voters to sign his Nomination Papers) that will *put his or her life* – and the lives of others – *at risk*.

F.  The Backdrop of the Top Two Open Primary System

Since 2012, California has implemented a Top Two Open Primary system, which requires all candidates running for state constitutional, U.S. Congressional, and state legislative offices are

1   to run against one another on a single, statewide primary election ballot.  Voters can vote for the
2   candidate of their choice for these offices, regardless of how they are registered.  The top two
3   finishers then advance to the general election in November.

4         This procedure, which has been in place since 2012, diminishes any concern that the State
5   may assert that making a COVID-19 accommodation to Mr. Blankenship would result in a
6   "crowded" ballot.  Namely, the Top Two Primary's open procedure, in which *any* candidate can
7   participate by simply paying a filing fee,[9] flies in the face of the massive signature gathering total
8   that California mandates for independent candidates for President.

9         For example, to qualify for the ballot, a candidate for California Governor need only
10  present 65 voter signatures and pay $3,916.12 (i.e., 2 percent of the Governor's $195,806 salary).
11  Alternatively, in lieu of paying $3,916.12, a candidate may gather up to 7,000 valid signatures,
12  with the filing fee reduced per signature on a *pro rata* basis.  Because the U.S. President's salary
13  is $400,000,[10] the comparable filing fee would be **$8,000.**

14  **III.    Jurisdiction and Venue**

15        This Court has federal-question jurisdiction in this case pursuant to 28 U.S.C. §1331, 42
16  U.S.C. §1983, and 42 U.S.C. §1988.  Defendants are state officials who maintain offices
17  throughout the State of California.  This Court has personal jurisdiction over Defendants, for they
18  are California public officials who are being sued in their official capacities.  Venue is proper
19  under 28 U.S.C. §1391, for Plaintiff Denise Pursche lives and votes in Contra Costa County.

20  **IV.    Legal Analysis**

21        A.    <u>Mr. Blankenship and Ms. Pursche Will Prevail on the Merits</u>

22        The Court has the power to issue a TRO under FRCP 65.  "The standard for
23  issuing a TRO is *the same as* that for issuing a preliminary injunction."[11]  To obtain a
24  preliminary injunction or TRO under the traditional test, a plaintiff must establish that (1)

---

[9] A copy of the Secretary of State's summary of filing-fee and signature requirements for 2018 California statewide candidates (e.g., Governor, Attorney General) has been attached as Dutta Decl. Exh. C.
[10] 3 U.S.C. §102.
[11] *Walker v. County of Santa Clara*, 5:10-cv-4668-JF, 2011 WL 4344212, at *2 (N.D. Cal. Sept. 15, 2011) (citations omitted).

1  he or she is likely to succeed on the merits, (2) he or she is likely to suffer irreparable
2  harm in the absence of preliminary relief, (3) the balance of equities tips in his favor, and
3  (4) that (in certain cases) an injunction would promote the public interest.[12]  To obtain a
4  TRO under the alternative, "serious questions" test, a TRO is appropriate when a plaintiff
5  shows that "serious questions going to the merits were raised and the balance of hardships
6  tips sharply in the plaintiff's favor."[13]

7  To appear on the California Presidential ballot under California's ballot-access
8  laws (the "Ballot Access Laws"), Mr. Blankenship and similarly situated independent
9  nominees must gather nearly 200,000 signatures of registered voters no later than Aug. 7,
10 2020.  Against the backdrop of the COVID-19 pandemic and the Governor's Stay-at-
11 Home Order, enforcement of the Ballot Access Laws is unconstitutional – because it not
12 only violates the constitutional right to association and political expression, but is poised
13 to deprive voters like Ms. Pursche their constitutional right to vote for a candidate of their
14 choice.

15 As the Supreme Court admonished in *Williams v. Rhodes*, ballot access laws
16 "place burdens on two different, although overlapping, kinds of rights – the rights of
17 individuals to *associate for the advancement of political beliefs*, and the right of qualified
18 voters, regardless of their political persuasion, to *cast their vote effectively*.  Both of these
19 rights, of course, rank among our most precious freedoms."[14]  Indeed, as the High Court
20 noted, "other rights, even the most basic are illusory if the right to vote is undermined."[15]
21 Thus, when an election regulation imposes a severe burden on First Amendment rights,
22 strict scrutiny applies – and the state must show the law is narrowly tailored to achieve a

---

[12]  *Imperial v. Castruita*, 418 F.Supp.2d 1174, 1177-78 (C.D. Cal. 2006).
[13]  *Towery v. Brewer*, 672 F.3d 650, 657 (9th Cir. 2012).
[14]  *Williams v. Rhodes*, 393 U.S. 23, 30 (1968) (italics added) (*quoted by Esshaki v. Whitmer* ("*Esshaki I*"), ___F.Supp.3d___, 2:20-CV-10831-TGB, 2020 WL 1910154, at *4 (E.D. Mich. Apr. 20, 2020), *aff'd in relevant part* ("*Esshaki II*"), No. 20-1336, 2020 WL 218553 (6th Cir. May 5, 2020)).
[15]  *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964).

1  compelling governmental interest.[16]

2  *Severe Burden.*  Here, Defendants insist on robotically enforcing both the nearly **200,000** signature requirement and **Aug. 7, 2020** filing deadline imposed by the Ballot Access Laws, even though the *earliest* date (**Apr. 24, 2020**) on which Mr. Blankenship could legally gather signatures *occurred **after** the Governor had issued his Stay-at-Home Order*.  Yet at the same time, Defendants have deprived Presidential candidates like Mr. Blankenship of the ability to meet those requirements.

Indeed, the Stay-at-Home Order effectively *bans* signature-gathering, for it is impossible to approach voters to sign Nomination Papers without violating the requirement of keeping six feet of distance from them.  As another federal court recently noted, "doubling down" on signature-gathering efforts will "increas[e] the risk that Plaintiff and his supporters could possibly be exposed to the COVID-19 virus by engaging in repeated close-contact with potential petition signers or *unwittingly transmit it to others*".[17]

When combined with the Governor's Stay-at-Home Order, the Ballot Access Laws impose burdens so severe they "function as an absolute bar" to Mr. Blankenship's effort to appear on California's Presidential ballot.[18]  There is no other way for Mr. Blankenship's name to appear on the ballot.  Unless this Court swiftly intercedes, voters who seek to support Mr. Blankenship and his political beliefs will be deprived of their constitutional right to see – and vote for – his name on California's Presidential ballot.

Significantly, *every* federal court that has addressed this issue to date has found that signature requirements for ballot access impose severe burdens on candidates' rights during the COVID-19 pandemic.[19]  In Illinois, a district court enjoined the state's in-

---

[16]  *Rubin v. City of Santa Monica*, 308 F.3d 1008, 1014 (9th Cir. 2002); *accord*, *Esshaki II*, 2020 WL 218553.
[17]  *Esshaki I*, 2020 WL 1910154, at *5 (italics added).
[18]  *See Graveline v. Johnson*, 336 F.Supp.3d 801, 809 (E.D. Mich. 2018), *aff'd*, 747 F.App'x 408, 416 (6th Cir. 2018).
[19]  *See, e.g.*, *Esshaki II*, 2020 WL 218553; *Esshaki I*, 2020 WL 1910154; *Libertarian Party of Ill. v. Pritzker*, Civ. No. 1:20-cv-2112, 2020 WL 1951687 (N.D. Ill. Apr. 23, 2020); *Garbett v.*

1 person signature collection and witnessing requirements for ballot access, after the law
2 was challenged by minor political parties and voters who sought to vote for those parties'
3 candidates in the Nov. 2020 election.[20]  The court noted that due to restrictions on public
4 gatherings, the statutory signature requirements for ballot access had created a "nearly
5 insurmountable hurdle" for certain candidates to qualify for the Nov. 2020 ballot.[21]  As a
6 result, the court suspended the statutory signature requirements for the Nov. 2020 election
7 – slashing the number of signatures required for minor party and independent candidates
8 by **90 percent** of the statutory requirement.[22]

9 In the same vein, the Massachusetts Supreme Judicial Court eased signature-
10 gathering requirements in a similar challenge by Democratic and Republican candidates
11 seeking to appear on the state's primary ballot.[23]  In so doing, the court (1) observed that
12 "the traditional venues for signature collection are unavailable", and (2) noted that
13 gathering signatures "might risk the health and safety not only of the person requesting the
14 signature but also of the persons who are signing, of the families with whom they live, and
15 potentially of their *entire community*."[24]

16 To be sure, Defendants may deny that the Ballot Access Laws impose a severe
17 burden on Mr. Blankenship and Ms. Pursche.  *First*, Defendants may claim that Mr.
18 Blankenship has not been diligent in gathering signatures.  However, it is undisputed that,
19 under the Ballot Access Laws, Mr. Blankenship had been *barred* from gathering
20 signatures until Apr. 24, 2020 – i.e., *after* the Governor had issued the Stay-at-Home
21 Order.

---

*Herbert*, No. 2:20-cv-00245-RJS, 2020 WL 2064101, at *12 (D. Utah Apr. 29, 2020).  *See also Fla. Democratic Party v. Scott*, 215 F.Supp.3d 1250, 1257-58 (N.D. Fla. 2016) (in the wake of Hurricane Matthew, extending deadline to register to vote for the 2016 Presidential election); *Jones v. McGuffage*, 921 F.Supp.2d 888, 899 (N.D. Ill. 2013) (in special election, reducing statutory signature-gathering requirements during the peak of Chicago's bone-chilling winter).
[20] *Libertarian Party of Ill.*, 2020 WL 1951687, at *1.
[21] *Id.* at *4.
[22] *Id.*
[23] *Goldstein v. Sec'y of the Commonwealth*, 142 N.E.3d 560, 575 (Mass. 2020).
[24] *Id.* at 570 (italics added).

- 13 -                                    TRO MOTION

1    Simply put, approaching voters to sign the Nomination Papers would violate the
2    Stay-at-Home Order, for it is impossible to maintain a six-foot distance.  Furthermore, it is
3    neither reasonable nor humane to demand that *anyone* risk his or her *life* – or that of his or
4    her family, relatives, friends, or the community-at-large – at the altar of the State's Ballot
5    Access Laws.

6    *Second*, Defendants may insist that Mr. Blankenship could gather the nearly
7    200,000 signatures through a mail campaign.  Yet as another federal court addressing the
8    COVID-19 pandemic recently admonished, the "*financial burden* imposed by an
9    unforeseen but *suddenly required* mail-only signature campaign is far more than an
10   incidental campaign expense or reasonable regulatory requirement."[25]

11   *Finally*, Defendants may argue that even if his name does not appear on
12   California's Presidential ballot, Mr. Blankenship's supporters can write his name in.
13   However, as a district court recently noted, that argument has been rejected by the
14   Supreme Court.[26]

15   In short, "state action has *pulled the rug out from under* [Plaintiffs'] ability to
16   collect signatures."[27]  Therefore, Mr. Blankenship and Ms. Pursche have shown that the
17   Ballot Access Laws will impose a severe burden upon them, in the wake of the COVID-
18   19 pandemic.

19   *Strict Scrutiny*.  Because the combined application of the Ballot Access Laws and
20   the Stay-at-Home Order severely burdens Mr. Blankenship's rights as a Presidential
21   candidate and Ms. Pursche's rights as a voter, strict scrutiny must apply.[28]  However,
22   Defendants cannot show that the Ballot Access Laws are narrowly tailored to achieve a
23   compelling governmental interest, and Defendants have the legal authority to lower the
24   nearly 200,000 signature requirement.

---

[25] *Esshaki I*, 2020 WL 1910154, at *5 (italics added).
[26] *Id.* at *6 (quoting *Lubin v. Panish*, 415 U.S. 709, 719 n.5 (1974); *Anderson v. Celebrezze*, 460 U.S. 780, 799 n.26 (1983) & *Graveline*, 336 F.Supp.3d at 811.
[27] *Esshaki I*, 2020 WL 1910154, at *6 (italics added).
[28] *Rubin*, 308 F.3d at 1014; *Esshaki II*, 2020 WL 218553.

1    In response, Defendants will likely claim that the State has an interest in (1) ensuring that Presidential candidates appearing on the ballot have a "significant modicum of support", and (2) ensuring that the Presidential ballot is not "crowded".[29] However, such an argument would fail for at least three reasons.

*First*, as national ballot-access expert Richard Winger notes in his Declaration, states that require at least 5,000 signatures to qualify for the general election *do not have crowded ballots*. Historically, given a signature-gathering requirement of 5,000 or more, the number of independent and minor-party presidential candidates has only once exceeded six – a number that Justice Harlan indicated would carry no risk of voter confusion in his concurrence in *Williams v. Rhodes*.[30] Since a signature requirement of no more than 5,000 could achieve the state's purported interest in avoiding ballot clutter, a signature requirement of nearly 200,000 looms as disproportionate, excessive, and unreasonable in the wake of the COVID-19 pandemic.

*Second*, California's Top Two Open Primary, which has been in place since 2012, diminishes any concern that the State may assert that making an accommodation to Mr. Blankenship would result in a "crowded" ballot. Namely, the Top Two Primary's open procedure, in which *any* candidate can participate by simply paying a filing fee,[31] flies in the face of the massive signature gathering total that California mandates for independent Presidential candidates.

For example, to qualify for the ballot, a candidate for California Governor need only

---

[29]  *See Jenness v. Fortson*, 403 U.S. 431 (1971).
[30]  *Rhodes*, 393 U.S. at 46-47 ("Ohio law would permit as many as six additional party candidates to compete with the Democrats and Republicans . . . And with fundamental freedoms at stake, *such an unlikely hypothesis cannot support an incursion upon protected rights*, especially since the presence of eight candidacies cannot be said, in light of experience, to carry a significant danger of voter confusion.") (italics added). *See also Graveline*, 336 F.Supp.3d at 816 ("Based on an analysis of election returns for all 50 states over fifty years, Plaintiffs' expert [Richard Winger] opines that states that require 5,000 signatures for general election ballot access for independent candidates or new parties for statewide office will *not have a crowded ballot*.") (italics added).
[31]  A copy of the Secretary of State's summary of filing-fee and signature requirements for 2018 California statewide candidates (e.g., Governor, Attorney General) has been attached as Dutta Decl. Exh. C.

present 65 voter signatures and pay $3,916.12 (i.e., 2 percent of the Governor's $195,806 salary). Alternatively, in lieu of paying $3,916.12, a candidate may gather up to 7,000 valid signatures, with the filing fee reduced per signature on a *pro rata* basis. (Because the U.S. President's salary is $400,000,[32] the comparable filing fee would be $8,000.)

*Finally*, Defendants have the legal authority to issue emergency regulations on account of the COVID-19 pandemic, and they have already done so. On Mar. 20, 2020, Defendant Newsom issued Executive Order N-34-20, which acknowledged the danger posed by coronavirus to voting rights – declaring that the virus will "impair the ability of relevant state and local officials, including county elections officials and the Secretary of State, and the volunteers supporting them, to meet statutory deadlines associated with these responsibilities."[33]

In relevant part, the Mar. 20, 2020 Order stated that "in-person voting presents risks to public health and safety in light of the COVID-19 pandemic, and could risk *undermining social distancing measures* imposed by the State Public Health Officer[.]"[34] To ensure that California elections remain "accessible, secure, and safe", the Mar. 20, 2020 Order mandated that voters across California be given the option to vote by mail, without having to cast their votes in person.

Simply put, Defendants had the opportunity to ease the requirements of the Ballot Access Laws, but refused to do so. Irrespective of the purported interests that government officials assert in cases of this kind, the principal effect of massive signature requirements is merely to *exclude candidates from the ballot*. The COVID-19 pandemic only compounds the significant burdens and obstacles confronting independent candidates in California.

*Immediate, Irreparable Harm.* Unless the Court swiftly grants them relief, Mr. Blankenship and Ms. Pursche will suffer immediate, irreparable harm. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."[35] By preventing Mr. Blankenship from accessing the Presidential ballot, the Ballot

---

[32] 3 U.S.C. §102.
[33] Dutta Decl. Exh. D (italics added).
[34] Dutta Decl. Exh. D (italics added).
[35] *Elrod v. Burns*, 427 U.S. 347, 373-74 (1976).

1  Access Laws, combined with the Governor's Stay-at-Home Order "place burdens on two
2  different, although overlapping, kinds of rights – the rights of individuals to *associate for the*
3  *advancement of political beliefs*, and the right of qualified voters, regardless of their political
4  persuasion, to *cast their vote effectively*."[36]  Unless this Court grants swift relief, Mr.
5  Blankenship's name will be deprived of his constitutional *right* to appear on the Presidential
6  ballot – silencing the voices of Mr. Blankenship and his supporters.

7  *Balance of Equities*.  The balance of equities tip sharply in Mr. Blankenship's and Ms.
8  Pursche's favor.  Whether as a matter of prudence or constitutional law, forcing candidates and
9  their supporters to risk their health and violate the distance requirements of the Governor's Stay-
10  at-Home *violates* the public interest.  To be sure, Defendants may claim that the State will suffer
11  harm if its Ballot Access Laws are eased on account of the public-health emergency.  However,
12  the State cannot show that enforcing an unconstitutional regulatory regime would serve a
13  compelling interest.[37]   In stark contrast, denying injunctive relief to Mr. Blankenship and Ms.
14  Pursche will harm not only Mr. Blankenship and his supporters like Ms. Pursche, but the public
15  as a whole – because Californians like Ms. Pursche would be deprived of the ability to vote for
16  their Presidential candidate of choice.  There can be no question that the balance of equities tips
17  sharply in Mr. Blankenship's and Ms. Pursche's favor.

18  *Remedy*.  The Top Two Primary's open procedure, in which any candidate can participate
19  by simply paying a filing fee,[38] provides a ready template for relief for independent Presidential
20  candidates like Mr. Blankenship.  For example, to qualify for the ballot, a candidate for California
21  Governor need only present 65 voter signatures and pay $3,916.12 (i.e., 2 percent of the
22  Governor's $195,806 salary).  Alternatively, in lieu of paying $3,916.12, a candidate may gather
23  up to 7,000 valid signatures, with the filing fee reduced per signature on a *pro rata* basis.

---

[36]  *Rhodes*, 393 U.S. at 30 (italics added).
[37]  *E.g.*, *ACLU v. Ashcroft*, 322 F.3d 240, 251 n.11 (3d Cir. 2003) ("Neither the Government nor the public generally can claim an interest in the enforcement of an *unconstitutional law*.") (italics added).
[38]  A copy of the Secretary of State's summary of filing-fee and signature requirements for 2018 California statewide candidates (e.g., Governor, Attorney General) has been attached as Dutta Decl. Exh. C.

Here, because the U.S. President's salary is $400,000,[39] the comparable filing fee should be **$8,000.**  Alternatively, in lieu of paying $8,000, an independent Presidential candidate should be allowed to gather up to **7,000** voter signatures, with the filing fee reduced per signature on a *pro rata* basis.

**V.     Conclusion**

*This isn't golf:  there are no mulligans.  Once the ... deadline passes, there can be no do-over and <u>no redress</u>.*

-- *Florida Democratic Party v. Scott*[40]

Time is of the essence.  Unless this Court swiftly intercedes, the voices of Presidential candidate Donald Blankenship, Denise Pursche, and many other Californians will be silenced in the upcoming general election.

Accordingly, Mr. Blankenship and Ms. Pursche implore the Court to (1) issue a TRO prohibiting enforcement of California's filing deadline and signature requirements for Presidential candidates for California's Nov. 3, 2020 general election, as well as any substitute requirements that Defendants may subsequently adopt or promote that violate Plaintiffs' constitutional rights; (2) issue a TRO prohibiting Defendants Governor Gavin Newsom and Secretary of State Alex Padilla from printing the Nov. 3, 2020 Presidential ballot unless they agree to extend the statutory filing deadline and decrease the signature requirement to an achievable number in light of the COVID-19 public-health emergency; and (3) issue an Order to Show Cause why a preliminary injunction should not issue.

---

[39]   3 U.S.C. §102.
[40]   *Fla. Democratic Party*, 215 F.Supp.3d at 1258 (underlining added).

DATED: July 7, 2020

                    BUSINESS, ENERGY, AND ELECTION LAW, PC

                    By:  /s/ Gautam Dutta

                          GAUTAM DUTTA, ESQ.

                    Attorneys for Plaintiffs

                    DONALD BLANKENSHIP and

                    DENISE PURSCHE