1  XAVIER BECERRA
   Attorney General of California
2  MARK R. BECKINGTON
   Supervising Deputy Attorney General
3  LARA HADDAD
   Deputy Attorney General
4  State Bar No. 319630
     300 South Spring Street, Suite 1702
5    Los Angeles, CA  90013
     Telephone:  (213) 269-6250
6    Fax:  (916) 731-2124
     E-mail:  Lara.Haddad@doj.ca.gov
7  *Attorneys for Governor Gavin Newsom and*
   *Secretary of State Alex Padilla, in their Official*
8  *Capacities*

9              IN THE UNITED STATES DISTRICT COURT

10            FOR THE NORTHERN DISTRICT OF CALIFORNIA

11

12

| | |
|---|---|
| 13 **DONALD BLANKENSHIP and DENISE**<br>14 **PURSCHE,**<br>15 Plaintiffs,<br>16 **v.**<br>17<br>18 **GAVIN NEWSOM, in his official capacity as**<br>**Governor of California, and ALEX PADILLA,**<br>19 **in his official capacity as Secretary of State**<br>**of California,**<br>20 Defendants. | Case No. 3:20-cv-04479-RS<br><br>**STATE DEFENDANTS' OPPOSITION**<br>**TO PLAINTIFFS' APPLICATION FOR**<br>**TEMPORARY RESTRAINING ORDER**<br>**AND/OR PRELIMINARY INJUNCTION**<br><br>Courtroom:    3<br>Judge:          The Honorable Richard Seeborg<br>Trial Date:    Not set<br>Action Filed:  July 7, 2020 |

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 2

    I.     California's Independent Nomination System ....................................................... 2

    II.    California's Swift Response to the COVID-19 Pandemic and the Effect on Election Activities ................................................................................................ 3

    III.   Plaintiffs' Challenges to the Ballot Access Laws .................................................. 5

LEGAL STANDARD .......................................................................................................... 6

ARGUMENT ...................................................................................................................... 7

    I.     Plaintiffs Are Not Likely To Succeed on the Merits of Their Claims ................... 7

         A.    The Ballot Access Laws Do Not Impose a Severe Burden on Plaintiff Blankenship's Asserted Rights ...................................................... 7

             1.    The COVID-19 Pandemic Has Not Prevented Plaintiffs From Complying With the Ballot Access Laws ........................... 8

                  a.    Plaintiffs Have Not Shown "Reasonably Diligent Efforts" to Obtain the Required Signatures ...................... 9

                  b.    Federal Courts in California Have Denied Preliminary Relief to Enjoin Ballot Access Measures During the Pandemic ........................................................ 13

             2.    The State's Compelling Interest in Preserving the Integrity of the Electoral Process Is Undiminished by the Pandemic .......... 15

             3.    Even if Strict Scrutiny Applies, the Ballot Access Laws Are Constitutional ............................................................................ 17

         B.    The Ballot Access Laws Do Not Infringe On Plaintiff Pursche's Asserted Rights ......................................................................................... 18

    II.    Equitable Factors Weigh Heavily Against Issuance of a Temporary Restraining Order ............................................................................................... 19

         A.    A Temporary Restraining Order Would Not Provide Plaintiffs the Relief They Are Seeking .......................................................................... 19

         B.    Plaintiffs Will Not Suffer Irreparable Harm Absent Injunctive Relief ...................................................................................................... 19

CONCLUSION ................................................................................................................ 21

i

# TABLE OF AUTHORITIES

**Page**

CASES

*Abbott v. Perez*
138 S. Ct. 2305 (2018) ........................................................................................................20

*Alliance for the Wild Rockies v. Cottrell*
632 F.3d 1127 (9th Cir. 2011) ...............................................................................................6

*Am. Party of Texas v. White*
415 U.S. 767 (1974) .............................................................................................................16

*Angle v. Miller*
673 F.3d 1122 (9th Cir. 2012) .....................................................................................8, 9, 14

*Ariz. Libertarian Party v. Reagan*
798 F.3d 723 (9th Cir. 2015) ...............................................................................................12

*Arizonans for Fair Elections v. Hobbs*
No. CV-20-00658-PHX-DWL, 2020 WL 1905747 (D. Ariz. Apr. 17, 2020) .....................9, 14

*Burdick v. Takushi*
504 U.S. 428 (1992) ................................................................................................... *passim*

*Chamness v. Bowen*
722 F.3d 1110 (9th Cir. 2013) ...............................................................................................8

*Common Sense Party v. Padilla*
No. 2:20-cv-01091-MCE-EFB (E.D. Cal. June 26, 2020), 2020 WL 3491041 .............. *passim*

*De la Fuente v. Padilla*
930 F.3d 1101 (9th Cir. 2019) ..........................................................................8, 12, 16, 21

*Drakes Bay Oyster Co. v. Jewell*
747 F.3d 1073 (9th Cir. 2014) .............................................................................................20

*Esshaki v. Whitmer*
No. 2:20-CV-10831-TGB, 2020 WL 1910154 (E.D. Mich. Apr. 20, 2020) ...........................14

*Garbett v. Herbert*
No. 20-cv-00245 (D. Utah April 29, 2020), 2020 WL 2064101 .............................................15

*Garcia v. Google*
786 F.3d 733 (9th Cir. 2015) (en banc) .................................................................................7

*Givens v. Newsom*
No. 2:20-cv-00852-JAM-CKD, 2020 WL 2307224 (E.D. Cal. May 8, 2020) .........................6

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Goldstein v. Secretary of Commonwealth*
    142 N.E.3d 560 (Mass. 2020) ................................................................15

*Jenness v. Fortson*
    403 U.S. 431 (1971) .............................................................................16

*Kishore v. Newsom*
    No. 2:20-cv-05859 (C.D. Cal.)............................................................21

*Libertarian Party of Illinois v. Pritzker*
    No. 20-cv-2112, 2020 WL 1951687 (N.D. Ill. April 23, 2020)..............15

*Mazurek v. Armstrong*
    520 U.S. 968 (1997) ..............................................................................6

*Munaf v. Geren*
    553 U.S. 674 (2008) ..............................................................................6

*Munro v. Socialist Workers Party*
    479 U.S. 189 (1986) ..........................................................................8, 15

*Murray v. Cuomo*
    No. 1:20-CV-03571-MKV, 2020 WL 2521449 (S.D.N.Y. May 18, 2020)............14

*Nader v. Brewer*
    531 F.3d 1028 (9th Cir. 2008)........................................................8, 9, 14

*Nader v. Cronin*
    620 F.3d 1214 (9th Cir. 2010)..............................................................16

*Public Integrity Alliance v. City of Tucson*
    836 F.3d 1019 (9th Cir. 2016) (en banc)..............................................7, 8

*Reno Air Racing Ass'n, Inc. v. McCord*
    452 F.3d 1126 (9th Cir. 2006)................................................................6

*Stanley v. Univ. of So. Cal.*
    13 F.3d 1313 (9th Cir. 1994)..................................................................7

*Tanner Motor Livery, Ltd. v. Avis, Inc.*
    316 F.2d 804 (9th Cir. 1963)..................................................................7

*Thompson v. Dewine*
    959 F.3d 804 (6th Cir. 2020)........................................................ *passim*

iii

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Timmons v. Twin Cities Area New Party*
   520 U.S. 351 (1997) ........................................................................................................16

*Winter v. Nat. Res. Def. Council, Inc.*
   555 U.S. 7 (2008) ..............................................................................................................6

## STATUTES

California Elections Code
   § 5150(c) ..........................................................................................................................13
   § 5151(c) .....................................................................................................5, 10, 12, 15
   § 5151(c)(1) .......................................................................................................................3
   § 8400 .................................................................................2, 3, 6, 11, 15, 16
   § 8403 ............................................................................................. 6, 12, 15, 16
   §§ 8650-8653 ..................................................................................................................19

## COURT RULES

Fed. R. Civ. Proc.
   65(b)(1) ..............................................................................................................................6
   65(b)(2) ............................................................................................................................19

## OTHER AUTHORITIES

https://covid19.ca.gov/stay-home-except-for-essential-needs/ ....................................................4, 5

https://www.cisa.gov/identifying-critical-infrastructure-during-covid-19.........................................4

*Notary Public Listing*, https://www.sos.ca.gov/notary/notary-public-listing/ ...............................12

**INTRODUCTION**

Plaintiffs Donald Blankenship (the Constitution Party's candidate for President) and Denise Pursche (a supporter) seek to have Blankenship appear on the November 2020 general election ballot as an independent candidate for President.  They challenge the constitutionality of California's independent-nomination laws—recently upheld by the Ninth Circuit—that require prospective independent candidates for President to submit nomination papers with at least 196,964 signatures by August 7, alleging that it is "impossible" to gather signatures during the COVID-19 pandemic.  Plaintiffs' motion to preliminarily enjoin the signature requirement and accompanying deadline as applied to them is without merit and should be denied.

While it is undisputed that the COVID-19 pandemic has caused disruptions to the daily lives of Californians, Plaintiffs have failed to show a cognizable violation of their constitutional rights or any other basis for emergency or preliminary injunctive relief.  The challenged independent-nomination process and signature requirement and accompanying deadlines are generally applicable, evenhanded, politically neutral laws that protect the reliability and integrity of the election process and do not impose a severe burden on Plaintiffs' asserted rights, even in the current circumstances.

Moreover, Plaintiffs have not shown the diligence required to prevail on their First Amendment claim.  By all indications, Plaintiffs have made no effort to gather any signatures and have submitted no evidence that they ever had any concrete plans absent the pandemic to collect the requisite number to signatures to qualify for the ballot.  The State's public health orders do not restrict Plaintiffs' ability to gather signatures in person, and have not done so during the relevant time period.  Plaintiffs could also have gathered signatures by mail, if notarized or executed in the presence of the elections official, and could also have solicited support by traditional and social media, but they have not done so.  Plaintiffs also could have sought to have the Constitution Party qualify as a party, a process that requires fewer signatures and would allow the party nominee to be placed on the general election ballot.  Therefore, any alleged burden caused by California's independent-nomination requirements, even in light of the pandemic and the State's response, is not severe, and is amply justified by the State's compelling interest in

1

ensuring that independent candidates are able to demonstrate sufficient voter support before they are permitted to appear on the general election ballot as candidates for the office of the President.

In seeking emergency equitable relief, plaintiffs always bear a heavy burden.  Plaintiffs' requested relief would enable Plaintiffs to circumvent the State's election-law system of independent nominations, and—by temporary relief—permit them to appear on the November election ballot without demonstrating a bare modicum of voter support, without making any effort to solicit such support, and by merely paying a nominal fee for a position on the ballot.  As such, Plaintiffs seek a disfavored mandatory injunction that is subject to a heightened burden that they cannot satisfy.

Plaintiffs have also failed to show that the remaining equitable factors favor injunctive relief.  Significantly, granting preliminary relief would irreparably harm the public interest; if Plaintiffs could access the presidential ballot without demonstrating any significant modicum of voter support, or any attempt to gather such support, then anyone who meets the bare age, citizenship, and residency qualifications to be president, and who can pay a fee that Plaintiffs propose be a requirement, can seek to be placed on the ballot during the pandemic, leading to significant voter confusion and frustration of the democratic process.  Accordingly, State Defendants respectfully request that Plaintiffs' motion be denied.

## BACKGROUND

### I.   CALIFORNIA'S INDEPENDENT NOMINATION SYSTEM

In California, in order for a would-be independent candidate (including a candidate from a non-ballot-qualified party) for President to have his or her name printed in a general-election ballot, the candidate must prepare, and submit to a California county elections official, nomination papers signed by registered California voters at least equivalent in number to one percent of the entire number of registered California voters eligible to vote in the last general election.  Cal. Elec. Code, §§ 8400, 8303, 8304.[1]  Those signatures must be gathered and submitted within a 105-day period, between 193 days (here, April 24, 2020) and 88 days (here,

---

[1] All further statutory references are to the California Elections Code unless otherwise specified.

August 7, 2020) before the election.  § 8403 (together with § 8400, "Ballot Access Laws").  For the November 2020 general election, the nomination papers must be signed by at least 196,964 eligible voters.  Decl. of Rachelle Delucchi in Supp. of Opp'n to Pls. Mot. ("Delucchi Decl."), Ex. 1.

Such signatures may be gathered in different ways.  They can be gathered by taking in-person signatures, or the nomination papers can be sent for signature by circulators/signers by mail or email, or any other electronic means.  The circulators/signers may have the nomination papers notarized safely through the use of mobile notaries, or may execute the papers before an elections official free of charge.[2]  § 8407.

The nomination papers that are submitted to the county elections official by August 7, 2020, are then forwarded by the official to the Secretary of State.  § 8400.  The official ballots for the November 3, 2020 general election will not be printed until August 27, 2020, after a certified candidate list is issued by the Secretary of State's Office.  Delucchi Decl., Ex. 2, at p. 8-6.

A political body can field a nominee for President on the general election ballot by becoming a qualified political party, thereby avoiding the signature process set forth in Elections Code section 8400.  To do so, voter registrations numbering at least 0.33% of the total number of voters registered at least 123 days before the next general election must be submitted for the party in question.  Cal. Elec. Code, § 5151(c)(1).  Based on the current number of registered voters in California, a party must have 68,180 voter registrations to qualify for the November 2020 ballot, by July 3, 2020, which can be solicited by mail or through the internet and social media, and submitted at any time before the July deadline.  Delucchi Decl., Ex. 3, Ex. 4; *see also Common Sense Party v. Padilla*, No. 2:20-cv-01091-MCE-EFB (E.D. Cal. June 26, 2020), 2020 WL 3491041 at *1-2.

---

[2] The Secretary of State has issued guidance for notaries to safely notarize documents during the pandemic and in compliance with the shelter-in-place orders.  *See* Delucchi Decl., Ex. 2.

## II.   CALIFORNIA'S SWIFT RESPONSE TO THE COVID-19 PANDEMIC AND THE EFFECT ON ELECTION ACTIVITIES

California recognized early on that COVID-19 had the potential to spread rapidly throughout the state.  On March 4, 2020, the Governor proclaimed a State of Emergency in California to prepare for and respond to suspected or confirmed cases of COVID-19 in California and to implement measures to mitigate the spread of COVID-19.  *See* Haddad Decl., Ex. 1 at 2.  On March 19, 2020, the Governor issued Executive Order N-33-20, which directed all California residents to heed the directives to the State's Public Health Officer relating to COVID-19.  Haddad Decl., Ex. 2.  These directives (which are updated on an ongoing basis as circumstances change) are available at https://covid19.ca.gov/stay-home-except-for-essential-needs/.  When Executive Order N-33-20 was issued, state public health directives required "all individuals living in the State of California to stay home or at their place of residence except as needed to maintain continuity of operations of [16 specified] federal critical infrastructure sectors, as outlined at https:/www.cisa.gov/identifying-critical-infrastructure-during-covid-19."  Haddad Decl., Ex. 2; *see* Haddad Decl., Ex. 3 at 1 (State Public Health Order) (together with Executive Order N-33-20, the "State Orders").  The State Orders provide that "Californians working in these 16 critical infrastructure sectors may continue their work because of the importance of these sectors to Californian's health and well-being."  Haddad Decl., Ex. 3 at 2.  The 16 critical infrastructure sectors referenced in the State Order are identified by the U.S. Department of Homeland Security, Cybersecurity & Infrastructure Security Agency (CISA).  One of the critical infrastructure sectors identified by CISA is "Other Community- or Government-Based Operations and Essential Functions."  Haddad Decl., Ex. 4 at 12.  At least as of March 28, 2020, that section included "[e]lections personnel" which "include both public and private sector elections support."  *Id.*  The State Orders also addressed other circumstances in which individuals who are not designated "Essential Critical Infrastructure Workers" may leave their houses, such as in order to "access such necessities as food, prescriptions, and health care."  Haddad Decl., Ex. 3 at 2.

In addition, the State Public Health Officer designated a list of "Essential Critical Infrastructure Workers" to "help state, local, tribal, and industry partners as they work to protect

4

communities, while ensuring continuity of functions critical to public health and safety, as well as economic and national security."  Haddad Decl., Ex. 5 at 1.  Included under the heading of "Government Operations and other community-based essential functions," the State Public Health Officer identified "Elections personnel" as "Essential Workforce."  *Id.* at 10.

Since the State Orders issued, the Governor has continued to emphasize that elections are essential to our democracy and that election-related activities are permissible under the State Orders.  On May 1, 2020, the "Stay home Q&A" page of California's COVID information website was updated.  Under the section titled "Protected activities," and in response to the question "What about Voting?", the website provided that "Elections are an essential activity" and advised that whenever persons "engage in any permissible activity—including the collection and dropoff of ballots, or other election-related  activities—be mindful of physical distancing and other measures to protect yourself and those around you."[3]  Declaration of Angelica Quirarte in Supp. of Opp'n to Pls.' Mot. (Quirarte Decl.) at ¶ 5.  That answer was later updated on June 5, 2020, to specifically identify as examples of permissible election-related activities "the collection of signatures to qualify candidates or measures for the ballot."  *Id.* at ¶ 9.

## III.   PLAINTIFFS' CHALLENGES TO THE BALLOT ACCESS LAWS

Plaintiff Donald Blankenship, the presidential nominee of the Constitution Party, seeks to be placed on the November 2020 general election ballot as an independent candidate for the office of President.  Compl., ¶ 1.  Plaintiff Denise Pursche is a California voter who supports Blankenship and does not want to be deprived of her "constitutional *right* to vote for Mr. Blankenship as an independent Presidential nominee."  Pls. Mot., Pursche Decl., ¶ 14 (emphasis in original).  The Constitution Party was formed in 1992 as the U.S. Taxpayers Party, and changed its name to the Constitution Party in 1999.  Pls. Mot., Blankenship Decl., ¶¶ 6-7.  There is no recent evidence that the Constitution Party has attempted to qualify as a political party pursuant to Elections Code section 5151(c).[4]

---

[3] The State's COVID-19 information website is available at https://covid19.ca.gov/stay-home-except-for-essential-needs/.

[4] According to the Secretary of State's website, a party called the Constitution Party of California is currently attempting to qualify as a political party, but it appears to be a separate

1    Plaintiff Blankenship was named the Constitution Party's nominee for President of the

2   United States on May 2, 2020.  Pls. Mot., Blankenship Decl., ¶ 8.  Since that time, neither he nor

3   his campaign appear to have gathered any signatures in support of his nomination, and they

4   apparently have no plans to do so.  *See* Pls. Mot., Blankenship Decl., ¶¶ 16, 18.  He states that

5   while he "had planned to collect over 200,000 signatures by using a combination of volunteers

6   and paid signature gatherers," *id.* at ¶ 15, he is "not willing to have anyone engage in an

7   activity . . . that will put his or her life – and the lives of others – *at risk*."  *Id.* at ¶ 18 (emphasis in

8   original).

9    Plaintiffs bring these as-applied constitutional challenges to California Elections Code

10   section 8400 and 8403 on the basis that together, they a) deprive Plaintiff Blankenship from

11   obtaining a spot on the general election ballot, in violation of the First and Fourteenth

12   Amendments, Compl., ¶¶ 33-39; and b) deprive Plaintiff Pursche of an effective choice at the

13   ballot.  Compl., ¶¶ 40-45.  In support of their motion, they submit a declaration from Richard

14   Winger, who asserts that 5,000 signatures could achieve the state's interests by keeping the

15   number of independent presidential candidates under six.  Pls. Mot., Winger Decl., ¶ 12.

16                                        **LEGAL STANDARD**

17    TROs are emergency measures, intended to preserve the status quo pending a full hearing

18   on the injunctive relief requested, and the irreparable harm must therefore be immediate.  Fed. R.

19   Civ. Proc. 65(b)(1); *see Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1131 (9th Cir.

20   2006).  Such relief is an "extraordinary and drastic remedy," *Munaf v. Geren*, 553 U.S. 674, 690

21   (2008), hinging on "a significant threat of irreparable injury that must be imminent in nature."

22   *Givens v. Newsom*, No. 2:20-cv-00852-JAM-CKD, 2020 WL 2307224, at *3 (E.D. Cal. May 8,

23   2020) *appeal docketed*, No. 20-15949 (9th Cir. May 19, 2020) (internal citations omitted).

24    TROs are subject to standards similar to those governing preliminary injunctions.  Plaintiffs

25   must show that they are likely to succeed on the merits, that they are likely to suffer irreparable

26

27   _____

28   organization.  *See* https://www.sos.ca.gov/elections/political-parties/political-bodies-attempting-qualify/ (last visited July 10, 2020).

1   harm without emergency relief, that the balance of equities tips in their favor, and that an

2   injunction is in the public interest.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

3       Alternatively, injunctive relief "is appropriate when a plaintiff demonstrates that serious

4   questions going to the merits were raised and the balance of hardships tips sharply in the

5   plaintiff's favor." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir.

6   2011).  Even under this alternative sliding scale test, plaintiffs must make a showing of all four

7   *Winter* factors. *Id*. at 1132, 1135.  Injunctive relief "is 'an extraordinary and drastic remedy, one

8   that should not be granted unless the movant, by a clear showing, carries the burden of

9   persuasion.'" *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

10      Significantly, preliminary injunctions that would alter the status quo are "particularly

11  disfavored." *Stanley v. Univ. of So. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994) (quotation omitted).

12  "It is so well settled as not to require citation of authority that the usual function of a preliminary

13  injunction is to preserve the status quo ante litem pending a determination of the action on the

14  merits." *Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804, 808 (9th Cir. 1963).

15                                  **ARGUMENT**

16      The Court should not issue a temporary restraining order because Plaintiffs have failed to

17  show they need emergency relief: they have not shown and cannot show that they will suffer

18  irreparable harm without one.  Indeed, there is no basis for either a temporary restraining order or

19  a preliminary injunction, because they fail to satisfy the four equitable factors that the Court

20  weighs in determining whether to grant such extraordinary relief.  Plaintiffs' application is subject

21  to a heightened standard because they seek a mandatory injunction by requesting an injunction

22  against the status quo of the statutory standard set by the Legislature for independent-candidate

23  nominations.  In contrast to prohibitory injunctions designed to preserve the status quo during

24  litigation, "mandatory" injunctions go "well beyond simply maintaining the status quo *pendent*

25  *lite*." *Stanley*, 13 F.3d at 1320 (quotation omitted).  In addition to satisfying the requisite

26  equitable factors, Plaintiffs must meet the "doubly demanding" burden of "establish[ing] that the

27  law and facts *clearly favor* [their] position.'" *Garcia v. Google*, 786 F.3d 733, 740 (9th Cir.

28  2015) (en banc) (emphasis in original).  Plaintiffs cannot make this showing.

**I.    PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS**

**A.    The Ballot Access Laws Do Not Impose a Severe Burden on Plaintiff Blankenship's Asserted Rights**

In examining challenges to state election laws based on First and Fourteenth Amendment rights, as here, the Supreme Court has developed a flexible balancing and means-end fit standard: when state law impose "severe restrictions" on rights to access the ballot, strict scrutiny is appropriate, but when state election laws impose only "'reasonable, non-discriminatory restrictions . . . the State's important regulatory interests are generally sufficient to justify' the restrictions." *Burdick v. Takushi,* 504 U.S. 428, 434 (1992) (quotations omitted); *see Public Integrity Alliance v. City of Tucson*, 836 F.3d 1019, 1024 (9th Cir. 2016) (en banc).  To apply this balancing standard, courts weigh "the character and magnitude" of the asserted injury against the "interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration the extent to which the State interests make the burden necessary.  *Id.*

For a ballot-access law, such as those at issue here, the burden placed on the candidate by the law is "measure[d] by whether, in light of the entire statutory scheme regulating ballot access, 'reasonably diligent' candidates can normally gain a place on the ballot, or whether they will rarely succeed in doing so." *Nader v. Brewer*, 531 F.3d 1028, 1035 (9th Cir. 2008); *see Angle v. Miller*, 673 F.3d 1122, 1133 (9th Cir. 2012).  Applying these precepts, the Ninth Circuit has "repeatedly upheld as 'not severe' restrictions that are generally applicable, evenhanded, politically neutral, and protect the reliability and integrity of the election process," *Public Integrity Alliance*, 836 F.3d at 1024 (internal quotation omitted), and has "noted that 'voting regulations are rarely subject to strict scrutiny." *Chamness v. Bowen*, 722 F.3d 1110, 1116 (9th Cir. 2013) (citation omitted).  The balancing framework is a "sliding scale—the more severe the burden imposed, the more exacting our scrutiny; the less severe, the more relaxed our scrutiny." *De la Fuente v. Padilla*, 930 F.3d 1101, 1105 (9th Cir. 2019) (quotations omitted).

Under this balancing standard, Plaintiffs have failed to show that they are likely to succeed on their merits of their claims, particularly in light of the "doubly demanding" hurdle they must overcome in seeking a mandatory injunction.

8

1      **1.**    **The COVID-19 Pandemic Has Not Prevented Plaintiffs From Complying With the Ballot Access Laws**

The Supreme Court has established with "unmistakable clarity" that "[s]tates have an undoubted right to require candidates to make a preliminary showing of substantial support in order to qualify for a place on the ballot." *Munro v. Socialist Workers Party*, 479 U.S. 189, 194 (1986) (citation and internal quotation marks omitted).  Plaintiffs allege that the Ballot Access Laws' requirements, taken with the Governor's emergency orders and the ongoing COVID-19 pandemic, "function as an absolute bar to Mr. Blankenship's effort to appear on California's presidential ballot." *See* Pls. Mot. at 12 (quotations omitted).  Yet they fail to allege any facts in support of their contention.

    **a.**    **Plaintiffs Have Not Shown "Reasonably Diligent Efforts" to Obtain the Required Signatures**

Plaintiffs cannot show a severe burden here, because they have not demonstrated a reasonable diligence in gathering signatures.

To show that an election requirement imposes a severe burden, under Ninth Circuit precedent, Plaintiffs must show reasonable diligence in gathering signatures.  *See Nader*, 531 F.3d at 1035; *Angle*, 673 F.3d at 1133.  In the context of facial challenges (which do not turn on facts specific to a particular plaintiff), it is appropriate to look to evidence of impacts on parties other than a particular plaintiff—i.e., by independent nomination more generally. See, e.g., *Arizonans for Fair Elections v. Hobbs*, No. CV-20-00658-PHX-DWL, 2020 WL 1905747, at *2 (D. Ariz. Apr. 17, 2020).  Because Plaintiffs here bring an as-applied challenge, rather than a facial challenge, the Court should confine its inquiry to whether Plaintiffs, specifically, have been reasonably diligent.  *See Fair Maps Nevada v. Cevagske*, 2020 WL 2798018 (D.C. Nev. 2020), at *1.  But even if the Court were to look at evidence of impacts on parties other than Plaintiffs, Plaintiffs would still fall short, because they have submitted no evidence related to any other candidates seeking access to the ballot by independent nomination.  And Plaintiffs have failed to show that they were reasonably diligent in attempting to obtain the required number of signatures for Plaintiff Blankenship's own nomination.

9

1   It is undeniable that Plaintiffs, like all other Californians, have been negatively impacted by

2   the pandemic.  However, even if Plaintiffs face additional difficulty in procuring signatures in

3   person than before the pandemic, it cannot be said that Plaintiffs are excluded from the ballot

4   because of the challenged requirements, as opposed to their own inaction.  *See Thompson v.*

5   *Dewine*, 959 F.3d 804, 810 (6th Cir. 2020) ("[J]ust because procuring signatures is now harder

6   (largely because of a disease beyond the control of the State) doesn't mean that Plaintiffs are

7   *excluded* from the ballot.") (emphasis in original).  Here, Plaintiffs have not demonstrated any

8   diligence (much less "reasonable" diligence) in attempting to gather the requisite number of

9   signatures to secure independent nomination.

10   Plaintiffs assert that the Stay-at-Home Order has "barred" them from collecting signatures.

11   Pls. Mot. at 13.  Not so.  Governor Newsom clarified the order on March 28 that activities

12   relating to the elections process are essential.  Haddad Decl., Ex. 3.  And on May 1—the day

13   before Plaintiff Blankenship received the nomination for the Constitution Party— the State

14   further clarified that "election-related activities" are "permissible activities" under the State

15   Orders.   Quirarte Decl. at ¶ 5.  There has been no prohibition by the State on Plaintiff

16   Blankenship's ability to collect signatures from the date that he received his party's nomination

17   on May 2.

18   Despite their burden to show diligence, Plaintiffs do not allege that they ever started

19   signature-gathering efforts or engaged in any communications with any potential signatories after

20   the pandemic began.  *See Thompson*, 959 F.3d at 810 (no First Amendment violation where

21   plaintiff could have "advertise[d] their initiatives within the bounds of our current situation [of

22   the COVID-19 pandemic], such as through social or traditional media inviting interested electors

23   to contact them").  Plaintiffs have submitted no evidence of having gathered signatures; they have

24   provided no explanation for what, if any, efforts they expended to gather signatures; and they

25   have provided no evidence as to how they would obtain even the lower number of signatures that

26   they urge the Court to adopt.  By their own allegations, Plaintiffs appear to have done nothing to

27   gather any signatures in the more than two months since Plaintiff Blankenship received his

28   party's nomination on May 2, and instead have filed this lawsuit.  They also appear to have

10

1    ignored the phased reopening California has entered. *See Common Sense*, 2020 WL 3491041 at

2    *12-13 (In determining that the requirements of Elections Code section 5151(c) during the

3    pandemic do not pose a severe burden, the Court observed that in light of California's phased

4    reopening, "it is unclear what efforts Plaintiffs have undertaken to try to continue to collect its

5    [signatures]").

6       Plaintiffs submitted a declaration of one individual who stated that she intends to help

7    Plaintiff Blankenship qualify for the November ballot, but will not seek to have potential voters

8    sign his nomination papers because of the risks presented by the COVID-19 pandemic to her life.

9    Pursche Decl. at ¶¶ 7, 13.  She does not state, however, that she would have solicited signatures

10   absent the pandemic.  There is also no evidence that Plaintiffs have recruited any other volunteers

11   or paid signature-gatherers to collect signatures on Plaintiff Blankenship's behalf.  Therefore,

12   Plaintiffs have failed to show that they were reasonably diligent, or took any steps whatsoever, in

13   timely gathering the requisite number of signatures to comply with section 8400.

14       Without offering supporting facts, Plaintiffs also assert that "approaching voters to sign the

15   Nomination Papers" is "impossible" to do while maintaining a six-foot distance.  Pls. Mot. at 14.

16   While it may be inconvenient, awkward, or difficult to maintain a six-foot distance while talking

17   to prospective candidates and obtaining signatures, Plaintiffs have not demonstrated that it is

18   "impossible," and they have not demonstrated that this alleged result cannot be attributed to the

19   signature requirement of section 8400.  *See Thompson*, 959 F.3d at 810. ("[W]e cannot hold

20   private citizens' decisions to stay home for their own safety against the State.").  There is no

21   dispute that section 8400 is generally applicable, evenhanded, politically neutral, and protects the

22   reliability and integrity of the election process.  Therefore, section 8400 and its independent-

23   nomination signature requirement do not impose a severe burden on Plaintiffs' asserted rights

24   even in light of the pandemic and the State Orders.  *See Thompson*, 959 F.3d at 810 ("Because the

25   state has not excluded plaintiffs from the ballot, the burden imposed on them by the state's

26   initiative requirement cannot be severe").

27       Indeed, successful signature-gathering campaigns are possible under the current

28   circumstances with reasonable diligence, as other electioneering efforts have shown.  For

1   example, as of July 2, 2020, the proponent of a ballot initiative submitted petitions containing

2   over 900,000 signatures at the end of May and is awaiting signature verification.  Delucchi Decl.,

3   Ex. 5.  And the proponents of at least three other ballot initiatives had submitted petitions in April

4   and May that each contained over 900,000 raw signatures and have qualified for the ballot.  *Id.*,

5   Exs. 6-8.

6        While the pandemic and the State Orders might have limited Plaintiffs' ability to gather

7   signatures in person for a period of time, Plaintiffs have had, and still have, other means to gather

8   signatures for their independent nomination.  In addition to in-person solicitation of signatures,

9   Plaintiffs may solicit signatures by mail: they may send the nomination papers for signature to

10  circulators or potential circulators by mail or email, or any other electronic means, who may sign

11  the papers themselves.  The circulators/signers may sign the nomination papers, have them

12  notarized safely through the use of mobile notaries or executed before an elections official, and

13  then forward them to the county election officials.[5]  *See* Delucchi Decl., Ex. 2; § 8407.

14       Further, the Constitution Party could have tried to qualify as a political party pursuant to

15  Elections Code section 5151(c), thereby qualifying Plaintiff Blankenship for the November

16  general election ballot as its official candidate: as noted above, Plaintiffs would have had needed

17  far fewer voter registrations than the signatures it needs now, and would have had ample time to

18  solicit those registrations.  These additional options show that the burden imposed by sections

19  8400 and 8403 are far less than severe.  *See Common Sense Party*, 2020 WL 3491041 at *12.

20  And Plaintiffs have also failed to show any facts tending to the conclusion that they would have

21  been successful in gathering enough signatures absent the restrictions caused by the COVID-19

22  pandemic.

23       Taken as part of the overall voting scheme in California, the Ballot Access Laws do not

24  impose a severe burden on Plaintiffs because Plaintiff Blankenship has other means of qualifying

25  for the November general election ballot.  *Ariz. Libertarian Party v. Reagan*, 798 F.3d 723, 730

26  (9th Cir. 2015) ("[Courts] must examine the entire scheme regulating ballot access").  In

27

28   ───────────────
     [5] There are over 150,000 notaries in California.  *See* Secretary of State, *Notary Public Listing*, https://www.sos.ca.gov/notary/notary-public-listing/ (as of July 8, 2020).

dismissing a recent facial challenge to the same Ballot Access Laws at issue here, the Ninth Circuit noted that although a candidate "argues that his individual burden is severe because he might not appear on the ballot, California's overall scheme does not significantly impair ballot access." *De la Fuente*, 930 F.3d at 1105.  The Court observed that there are multiple ways that minor party candidates can get on the ballot, and indeed, minor party candidates have consistently appeared on the ballot alongside major party candidates. *Id.* at 1106 ("[A] plain reading of both the statutes . . . supports the conclusion that sections 8400 and 8403 are not severe restrictions"). The alternative means of gathering signatures greatly lessens any alleged burden on Plaintiffs. *See Thompson*, 959 F.3d at 810 (no First Amendment violation where plaintiff could have "advertise[d] their initiatives within the bounds of our current situation [of the COVID-19 pandemic], such as through social or traditional media inviting interested electors to contact them").  Plaintiffs have failed to show that the Ballot Access Laws impose a severed burden on them and is subject to strict scrutiny, and the statutes therefore must be justified only by the state's important regulatory interests. *See Burdick*, 504 U.S. at 434.

### b. Federal Courts in California Have Denied Preliminary Relief to Enjoin Ballot Access Measures During the Pandemic

Plaintiffs assert that "*every* federal court that has addressed this issue to date has found that signature requirements for ballot access impose severe burdens on candidates' rights during the COVID-19 pandemic."  Pls. Mot. at 12 (emphasis in original).  Plaintiffs are clearly wrong. Indeed, consistent with the analysis above, multiple federal courts have denied preliminary injunctive relief to enjoin similar ballot access measures during the COVID-19 pandemic.  On June 26, the District Court for the Eastern District denied the plaintiffs' motion to enjoin the enforcement of Elections Code section 5150(c) (which, as described above, sets forth the requirements for a political party to qualify a candidate for President on the general ballot). *Common Sense Party*, 2020 WL 3491041 (applying a flexible balancing approach because the challenged law did not impose a severe burden on the plaintiffs, notwithstanding the ongoing pandemic).  The district court determined that even in light of the pandemic and the state's stay-at-home orders, plaintiffs "failed to show they are likely to succeed in proving that the burden

1   imposed by [the challenged law] under these pandemic-related circumstances is close to severe"

2   because the plaintiffs had means other than in-person solicitation to collect voter registrations,

3   such as by mail or email and by tradition and social media.  *Id.* at *6.  The court concluded "that

4   the State has compelling interests which outweigh the burden imposed on Plaintiffs" by the

5   challenged statute.[6]  *Id.* at *13.

6       The instant case is also akin to the Sixth Circuit's recent decision in *Thompson* denying a

7   preliminary-injunction motion filed by initiative proponents against Ohio's in-person signature-

8   gathering requirement.  There, the court determined that Ohio had exempted conduct protected by

9   the First Amendment from its stay-at-home order, but the court found it significant that Ohio had

10   begun to lift its stay-at-home restrictions.  *Thompson*, 959 F.3d at 810.  The court concluded that

11   even if the state orders had applied to plaintiffs, the orders imposed only a five-week period from

12   the lifting of the state restrictions until the deadline to submit an initiative petition, which

13   "undermine[d] Plaintiffs' argument that the State ha[d] excluded them from the ballot."  *Id.*

14       Other courts around the country have similarly denied preliminary relief based on

15   challenges to ballot-access measures even in the midst of the continuing pandemic.  *See*, *e.g.*,

16   *Murray v. Cuomo*, No. 1:20-CV-03571-MKV, 2020 WL 2521449 (S.D.N.Y. May 18, 2020)

17   (denying TRO application challenging New York's signature requirement for ballot access

18   because challenged COVID-19-related restrictions are reasonable and non-discriminatory and

19   furthers both the state's interest in protecting public health and interest in ensuring the orderly

20   conduct of election); *Arizonans for Fair Elections v. Hobbs*, No. CV-20-00658-PHX-DWL, 2020

21   WL 1905747, *2 (D. Ariz. Apr. 17, 2020) (denying plaintiffs' TRO application because plaintiffs

22   failed to show a severe burden even though the pandemic has created havoc on initiative

23   committees' ability to gather signatures, some committees were able to gather enough signatures

24   to qualify initiatives before the pandemic took hold).

25       By contrast, the cases that Plaintiffs cite to for support are inapposite.  In *Esshaki v.*

26   *Whitmer*, the Michigan district court enjoined the enforcement Michigan's signature-gathering

27

28       [6] The district court also noted skepticism that the plaintiffs would have collected sufficient
registration to participate in the November 2020 election.  *Id.* at *6, n.6.

1    requirements for a Congressional candidate to appear on the ballot. *Esshaki v. Whitmer*, No.

2    2:20-CV-10831-TGB, 2020 WL 1910154, at *1 (E.D. Mich. Apr. 20, 2020), *aff'd in part*, ---Fed.

3    Appx.---, 2020 WL 2185553 (6th Cir. May 5, 2020).  As an initial matter, *Esshaki* is inapplicable

4    here because, as a decision by an out-of-circuit court, it did not apply the Ninth Circuit

5    reasonable-diligence analysis set out in *Nader* and *Angle*.  Furthermore, a significant part of the

6    district court's consideration in *Esshaki* was that Michigan's prohibition on signature gathering

7    remained in place through the deadline for petition submission.[7]  *Esshaki*, 2020 WL 1910154, at

8    *1; *see Thompson*, 959 F.3d at 809.  By contrast here, there has been no state restriction on in-

9    person signatures since Plaintiff Blankenship received his party's nomination, and Plaintiffs have

10   not alleged that they have attempted at any time to gather such signatures.  In *Libertarian Party of*

11   *Illinois v. Pritzker*, No. 20-cv-2112, 2020 WL 1951687 (N.D. Ill. April 23, 2020), the only

12   method for minor party candidates to get on the November ballot was through in-person

13   signatures, as opposed to the multiple methods available here.  *Libertarian Party*, 2020 WL

14   1951687 at *4.  In another case in Utah, the district court noted that there were only two ways by

15   which the candidate could run for governor, either through a major party convention or through

16   the collection of signatures; plaintiff had collected 75% of the signatures required before the

17   state's "stay home" directives were implemented; and demonstrated attempts to collect signatures

18   after the directives were in place.  *Garbett v. Herbert*, No. 20-cv-00245 (D. Utah April 29, 2020),

19   2020 WL 2064101 at *1, 4, *appeal docketed*, No. 20-4051 (10th Cir. May 1, 2020).  Plaintiffs

20   also cite to a Massachusetts state court case, which concerned varying requirements to qualify for

21   the ballot for multiple offices in that state's primary elections.  *Goldstein v. Secretary of*

22   *Commonwealth*, 142 N.E.3d 560 (Mass. 2020).  That decision, however, rested primarily on

23   Massachusetts state law (inapplicable here) and involved statutes that allowed for no other way of

24   getting on the ballot other than in-person signatures; further, the state's stay-at-home orders did

25   not allow for election-related activities. *Id.* at 566-569.

26

27

28   _____

     [7] In *Esshaki*, the deadline to submit signatures was April 21, 2020, while the state's stay-
     at-home order restricted public gatherings beginning on March 23, 2020.  *Id.*

Here, Plaintiffs had and still have the ability to gather signatures in person or by mail, if notarized.  And Plaintiffs could have taken steps to solicit registrations to qualify the Constitution Party pursuant to section 5151(c) even after Plaintiff Blankenship received the nomination, a significantly lower threshold.  But they appeared to have taken no available course of action. Plaintiffs have therefore failed to show that Elections Code sections 8400 and 8403 impose a severe burden on them and are subject to strict scrutiny.

### 2. The State's Compelling Interest in Preserving the Integrity of the Electoral Process Is Undiminished by the Pandemic

"States have an undoubted right to require candidates to make a preliminary showing of substantial support in order to qualify for a place on the ballot."  *Munro v. Socialist Workers Party*, 479 U.S. 189, 194 (1986) (quotations omitted).  Interests include the "preservation of the integrity of the electoral process and regulating the number of candidates on the ballot to avoid undue voter confusion."  *Am. Party of Texas v. White*, 415 U.S. 767, 782 n. 14 (1974); *Jenness v. Fortson*, 403 U.S. 431, 442 (1971); *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 364 (1997).  In upholding a challenge to a similar 1% signature requirement in Hawaii, the Ninth Circuit cited to these very state interests that justified the requirement, and noted that the statute at issue assures "that the winner is the choice of a majority, or at least a strong plurality, of those voting, without the expense and burden of runoff elections."  *Nader v. Cronin*, 620 F.3d 1214, 1218 (9th Cir. 2010) (quoting *Bullock,* 405 U.S. at 145).

In affirming the dismissal of another recent challenge to sections 8400 and 8403, the Ninth Circuit held that the State has important interests "in requiring some preliminary showing of a significant modicum of support" and "in avoiding confusion, deception, and even frustration of the democratic process at the general election."  *De La Fuente*, 930 F.3d at 1106 (quotation omitted).  "California's ballot regulations [relating to independent nomination] seek to protect its 'important regulatory interests,' in streamlining the ballot, avoiding ballot overcrowding, and reducing voter confusion."  *Id.* (internal citation omitted).  "The right to access the ballot is important to voters, candidates, and political parties alike, but it must be balanced against California's need to manage its democratic process."  *Id.*

16

1    Plaintiffs dismiss the State's interests, summing them up as a desire to have an uncluttered

2    ballot.  Pls. Mot. at 15-16.  In support of their position, they submit a declaration from Richard

3    Winger, who opines that states that have a requirement of 5,000 signatures to qualify for the

4    general election do not have a crowded ballot, as there are usually less than six candidates on the

5    ballot.  Pls. Mot., Winger Decl., ¶ 12.  This opinion lacks foundation, does not take into account

6    the varying accompanying requirements that each state has along with its signature requirements,

7    and does not answer the question at issue: whether the Ballot Access Laws impose

8    unconstitutionally severe burdens on candidates.  The Ninth Circuit has already found that they

9    do not, and Winger's opinion is irrelevant.  There is also no evidence that Plaintiffs have been

10   able to or have made plans to obtain even 5,000 signatures.

11   Finally, Plaintiffs confusingly ask for different remedies in their declarations and motion

12   but none of those proposed remedies should be considered.  *See* Pls. Mot. at 17-18 (requesting

13   that State Defendants be enjoined from enforcing the Ballot Access Laws unless the statutory

14   filing deadline is extended and the number of required signatures is decreased to "an achievable

15   number" and suggesting that there instead be an $8,000 filing fee or a maximum 7,000 voter

16   signature requirement with a pro rata fee); *cf.* Pls. Mot., Decl. Blankenship, ¶¶ 21-23 (requesting

17   that the statutory requirements that apply for California *statewide* candidates for accessing the

18   voter-nominated *primary* election ballot be applied to his candidacy and that he be given until

19   August 27, 2020 to collect signatures in order to qualify for the ballot).  This Court should

20   disregard any attempts to compare requirements for qualification on a primary election ballot to

21   requirements for a general election ballot.  As the Supreme Court has observed, "[t]he primary

22   election is an integral part of the entire election process, and the State is within its rights to

23   reserve the general election ballot for major struggles and not a forum for continuing intraparty

24   feuds." *Burdick v. Takushi*, 504 U.S. 428, 439 (1992) (internal citations and quotations omitted).

25   Requirements that allow for easier access to the primary ballot cannot, therefore, be compared or

26   analyzed alongside requirements for general ballot access.

27   Granting any remedy that subverts the Ballot Access Laws' requirements would, as one

28   court recently noted, "wholly subvert these compelling state interests." *Common Sense Party*,

17

2020 WL 3491041 at *13-14.  Any burden imposed by the independent-nomination requirements on Plaintiffs' asserted rights is outweighed by compelling state interests even in light of the pandemic and State Orders.

### 3.  Even If Strict Scrutiny Applies, the Ballot Access Laws Are Constitutional

Even if the burden on Plaintiffs posed by the Ballot Access Laws were severe—and it is not—the statutes are constitutional because of the State's compelling interest and because they are narrowly drawn.  There is no less onerous means of achieving the State's compelling interests. The signature requirements are already limited to 1% of voters who had registered in the last election, and those signatures can be gathered over a period of several months.  Further, Plaintiffs had the alternative of seeking to qualify the Constitution Party itself, which would have allowed Plaintiff Blankenship to appear on the ballot.

Notably, Plaintiffs' own delay in bringing this challenge has effectively eliminated any other alternative relief.  As the Secretary of State's General Election Calendar shows, all signatures must be submitted to the county election officials by August 7, and there is then a series of deadlines that both county election officials and the Secretary of State must meet in order to finalize and certify the list of candidates by August 27.  Delucchi Decl., Ex. 4.  The only option the Court would have now would be to waive signature requirements for Plaintiffs entirely, thereby wholly subverting the State's compelling interests.

### B.  The Ballot Access Laws Do Not Infringe On Plaintiff Pursche's Asserted Rights

Plaintiff Pursche alleges that the Ballot Access Laws deprive her of her "constitutional right" to vote for Plaintiff Blankenship as an independent Presidential nominee.  Pls. Mot., Pursche Decl., ¶ 14.  But voters' rights are not absolute.  *See Bullock*, 405 U.S. at 143 (the fact that a State's system "creates barriers ... tending to limit the field of candidates from which voters might choose ... does not of itself compel close scrutiny").  The Supreme Court has "repeatedly upheld reasonable, politically neutral regulations that have the effect of channeling expressive activity at the polls."  *Burdick,* 504 U.S. at 438 (upholding Hawaii's lack of a provision for write-in candidates).  In analyzing whether voter rights have been infringed upon, courts weigh "the

18

1    character and magnitude of the asserted injury to the rights protected by the First and Fourteenth

2    Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the

3    State as justifications for the burden imposed by its rule," taking into consideration "the extent to

4    which those interests make it necessary to burden the plaintiff's rights." *Id.* at 434 (quoting

5    *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983).  "When a state election law provision imposes

6    only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights

7    of voters, 'the State's important regulatory interests are generally sufficient to justify' the

8    restrictions.  *Id.* (quoting *Anderson*, 460 U.S. at 788.)  Here, the Ballot Access Laws are

9    nondiscriminatory and reasonable, and are justifiable by the State's important regulatory interests,

10   as described at length above.

11         As the Supreme Court has noted, "the function of the election process is to winnow out and

12   finally reject all but the chosen candidates, not to provide a means of giving vent to short-range

13   political goals, pique, or personal quarrels.  Attributing to elections a more generalized expressive

14   function would undermine the ability of States to operate elections fairly and efficiently."

15   *Burdick*, 504 U.S. at 438 (internal citations and quotations omitted).  And here, unlike in *Burdick*,

16   Plaintiff Pursche may still be able to write in Plaintiff Blankenship's name should he not qualify

17   for the general election ballot.  *See* Cal. Elec. Code §§ 8650-8653.  Accordingly, the Ballot

18   Access Laws do not impermissibly burden Plaintiff Pursche's constitutional rights.

19   **II.     EQUITABLE FACTORS WEIGH HEAVILY AGAINST ISSUANCE OF A TEMPORARY
             RESTRAINING ORDER**

20

21         **A.     A Temporary Restraining Order Would Not Provide Plaintiffs the Relief
                    They Are Seeking**

22         This Court should refrain from issuing a temporary restraining order, because Plaintiffs

23   have not shown there is any emergency.  The deadline for Plaintiffs to file their signatures with

24   the Secretary of State is August 7, 2020—almost one month from the date of this filing.  Compl.

25   at ¶ 11.  Further, the alleged harm—that Plaintiffs will be prevented from appearing on the 2020

26   election ballot— has not occurred.  Nor would it occur on August 7, as candidates will not be

27   certified until August 27.  Delucchi Decl., Ex. 4.

28

19

1    Because Plaintiffs' alleged injury will not occur for over a month, a TRO will not provide

2    them with any remedy.  A TRO is an extraordinary measure designed to preserve the status quo

3    for no more than two weeks.  Fed. R. Civ. Proc. 65(b)(2) (a TRO may remain in effect only for a

4    period "not to exceed 14 days").  Plaintiffs request that the Court issue a TRO to, in part,

5    "prohibit enforcement of California's filing deadline and signature requirements for Presidential

6    candidates for California's Nov. 3, 2020 general election" and to prevent "printing the Nov. 3,

7    2020 Presidential ballot."  Pls. Mot. at 17-18.  Both of these events are outside of the fourteen-day

8    window that would be covered by any TRO that this Court might issue in the coming days.

9        **B.    Plaintiffs Will Not Suffer Irreparable Harm Absent Injunctive Relief**

10    But there is no basis for either a restraining order or preliminary relief. In addition to failing

11    to demonstrate a likelihood of success on the merits, Plaintiffs fail to show that they will suffer

12    irreparable harm, that the balance of equities weighs in their favor, or that it is in the public

13    interest to permit Plaintiff Blankenship to qualify for the November presidential general election

14    ballot without demonstrating the significant voter support required by the Ballot Access Laws.

15    Any alleged irreparable harm to Plaintiffs is speculative.  Plaintiffs have not shown that

16    they would have obtained sufficient number of signatures to be placed on the November election

17    ballot even without the pandemic or the resulting State Orders or local orders.  Plaintiffs do not

18    allege they have obtained any signatures, attempted to obtain any signatures, formulated any

19    plans to obtain signatures, or have sufficient resources to obtain signatures.  And they do not

20    allege any facts showing that they will do so even if given a lower signature threshold of 7,000.

21    Plaintiffs' delay in bringing their challenge to the Ballot Access Laws until more than two

22    months after Plaintiff Blankenship received his party's nomination demonstrates they face no real

23    harm: as the district court for the Eastern District observed in denying injunctive relief where the

24    plaintiffs challenged the requirements for a party to qualify for the ballot, "they waited some two

25    months to even initiate this action to challenge [the statute] itself.  If in-person solicitation was so

26    instrumental to Plaintiffs' success, it seems they would have filed their challenge immediately

27    rather than waiting so long during a critical time in their campaign." *Common Sense Party*, 2020

28    WL 3491041 at *13.  The exact same observation should be made of Plaintiffs here.

On the other hand, unless a statute is unconstitutional, enjoining a "State from conducting [its] elections pursuant to a statute enacted by the Legislature . . . would seriously and irreparably harm [the State]." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018).  Even in the midst of the COVID-19 pandemic, California would suffer irreparable harm if enjoined from conducting its election in accordance with its lawfully enacted ballot-access regulations, its ballots cluttered with candidates unable to demonstrate voter support.  *See Thompson*, 959 F.3d at 812.

The balance of the equities and public interest also clearly favor the Secretary of State and weigh against injunctive relief.  *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) ("When the government is a party, these last two factors merge.").  Giving effect to the will of the people by enforcing the laws they and their representatives enact serves the public interest. *See Thompson*, 959 F.3d at 812.  If this Court were to delay the August 7 deadline for Plaintiff Blankenship to obtain more signatures, this would harm the election process by upending the election timeline. Delucchi Decl., ¶ 13.

It would also be against the public interest if Plaintiff Blankenship is permitted to appear on the November election ballot without having demonstrated that they have a significant modicum of voter support or having expended any reasonable diligence to be placed on the ballot.  If Plaintiffs obtain the relief they seek, including permitting individuals who can pay a fee and obtain a small showing of support to be on the ballot without regard to current timeframes, then literally anyone meeting these qualifications would be able to do so as well, effectively buying a position on the ballot and potentially opening a floodgate of prospective candidates seeking to be placed on the ballot as independent presidential candidates for the November election.  To wit, one week before this case was filed, members of the Socialist Equality Party have sued the Governor and the Secretary of State in the U.S. District Court for the Central District of California with claims nearly identical to those asserted here, who also seek to have the independent-nomination signature requirement of section 8400 enjoined so that they may appear on the November election ballot for the offices of the President and Vice-President without having demonstrate a modicum of voter support.  *See Kishore v. Newsom*, No. 2:20-cv-05859 (C.D. Cal.).  Granting the relief Plaintiffs seek here would likely lead to an unmanageable and

1  overcrowded ballot for the November presidential general election that would cause voter

2  confusion and frustration of the democratic process.  *See De La Fuente*, 930 F.3d at 1106.  In

3  short, Plaintiffs cannot show that their alleged harms outweigh the harms to the public interest,

4  and cannot meet the heavy burden required for seeking a mandatory injunction.

5                                          **CONCLUSION**

6          For the reasons provided above, Plaintiffs' motion for a temporary restraining order and a

7  preliminary injunction should be denied.

8  Dated:  July 10, 2020                              Respectfully Submitted,

9                                                     XAVIER BECERRA
                                                      Attorney General of California
10                                                    MARK R. BECKINGTON
                                                      Supervising Deputy Attorney General
11

12

13                                                    */s/ Lara Haddad*_____
                                                      LARA HADDAD
14                                                    Deputy Attorney General
                                                      *Attorneys for Governor Gavin Newsom and*
15                                                    *Secretary of State Alex Padilla, in their*
                                                      *Official Capacities*
16

17

18

19

20

21

22

23

24

25

26

27

28

# CERTIFICATE OF SERVICE

Case Name:   **Blankenship, Donald, et al. v.**          No.     **3:20-cv-04479**
              **Gavin Newsom, et al.**

I hereby certify that on <u>July 10, 2020</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**STATE DEFENDANTS' OPPOSITION TO PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on <u>July 10, 2020</u>, at Los Angeles, California.


Lara Haddad                                   *s/ Lara Haddad*
Declarant                                        Signature