GAUTAM DUTTA (State Bar No. 199326)
BUSINESS, ENERGY, AND ELECTION LAW, PC
1017 El Camino Real # 504
Redwood City, CA  94063
Telephone:  415.236.2048
Email:  Dutta@BEELawFirm.com
Fax:  213.405.2416

Attorneys for Plaintiffs
DONALD BLANKENSHIP and DENISE PURSCHE

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DONALD BLANKENSHIP and DENISE PURSCHE<br><br>*Plaintiffs*,<br><br>vs.<br><br>GAVIN NEWSOM, in only his official capacity as Governor of California; and ALEX PADILLA, in only his official capacity as Secretary of State of California;<br><br>*Defendants*. | CASE NO. 3:20-cv-04479-RS<br><br>**PLAINTIFFS' NOTICE OF SUPPLEMENTAL AUTHORITY IN SUPPORT OF THEIR MOTION FOR TEMPORARY RESTRAINING ORDER AND / OR PRELIMINARY INJUNCTION**<br><br>JUDGE:  Hon. Richard Seeborg<br><br>Hearing Date:  Aug. 5, 2020, 10 am |

TO THE COURT, THE PARTIES, AND THEIR COUNSEL:

*Please take notice* of the following supplemental authority (filed today) that should be considered in connection with Plaintiffs' Motion for Temporary Restraining Order and/or Preliminary Injunction: *The Constitution Party of Virginia v. Virginia State Bd. of Elections* ("*Constitution Party*"), No. 3:20-cv-00349-JAG (E.D. Va. July 15, 2020), *attached as* **Exhibit A.**

In relevant part, *Constitution Party* lowered the number of signatures (from 5,000 to **2,500**) required for independent and minor-party Presidential candidates to appear on Virginia's Nov. 3, 2020 ballot.[1]

---

[1]  *The Constitution Party of Virginia v. Virginia State Bd. of Elections*, No. 3:20-cv-00349-JAG (E.D. Va. July 15, 2020), at 3, 15.

The *Constitution Party* court granted that relief, even though (1) Virginia law allowed independent and minor-party Presidential candidates to gather signatures beginning **Jan. 1, 2020** (i.e., well *before* Virginia's Mar. 30, 2020 shelter-in-place order was issued, (2) Virginia recently eased its shelter-in-place restrictions, and (3) the plaintiffs had waited "until the *eve* of the first signature deadline" to seek emergency relief.[2]

All signatures for independent and minor-party Presidential candidates remain due on Virginia's statutory deadline (**Aug. 21, 2020**).[3]

DATED: July 15, 2020

        BUSINESS, ENERGY, AND ELECTION LAW, PC

        By: /s/ Gautam Dutta
            GAUTAM DUTTA, ESQ.
        Attorneys for Plaintiffs
        DONALD BLANKENSHIP and
        DENISE PURSCHE

---

[2]    *Id.* at 3, 5, 13 & n.6 (italics added).

[3]    *Id.* at 3.

# EXHIBIT A

# Notice of Supplemental Authority

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

THE CONSTITUTION PARTY OF VIRGINIA, et al.,
    Plaintiffs,

v.      Civil Case No. 3:20-cv-349

VIRGINIA STATE BOARD OF ELECTIONS, et al.,
    Defendants.

## OPINION

In Virginia, independent and minor party candidates seeking national office must collect by petition a certain number of signatures from qualified voters to appear on the general election ballot. In this case, the plaintiffs—the Constitution Party of Virginia, Libertarian Party of Virginia, Green Party of Virginia, and Independent Green Party of Virginia, their candidates seeking to appear on the November, 2020 general election ballot, and some of the parties' members—have sued the Virginia State Board of Elections and its officials, seeking to suspend the petition signature requirements for the November, 2020 general election. They contend that the combination of the outbreak of Coronavirus Disease 2019 (COVID-19) and Virginia Governor Ralph Northam's response to the outbreak have made it impossible for them to satisfy the signature requirements. Thus, they allege that Virginia's petition signature requirements as applied to them for this election cycle violate their First and Fourteenth Amendment rights pursuant to 42 U.S.C. § 1983.

The Court held a bench trial in this case on July 13, 2020. For the reasons set forth in this Opinion, the Court concludes that Virginia's signature requirements impose a substantial burden on the plaintiffs' First and Fourteenth Amendment rights as applied to this election cycle. Thus, the Court analyzes the signature requirement under strict scrutiny. In light of COVID-19 and the

Governor's orders, the Court further holds that Virginia's signature requirements are not narrowly enough tailored to the defendants' interests to justify the substantial burden imposed by strict scrutiny. Accordingly, the Court will enjoin enforcement of the signature requirements as to the named plaintiffs in this election cycle and will modify the requirements as follows:

1. The Court will extend the deadline for the named plaintiffs running as candidates for the U.S. House of Representatives and U.S. Senate to August 1, 2020, at 7:00 p.m. *See* Va. Code Ann. § 24.2-507.

2. The Board of Elections must lower the signature requirements for the named plaintiffs running as candidates for the U.S. House of Representatives and U.S. Senate to 35 percent of the total petition signatures required by Virginia Code § 24.2-506(A)(1), (2).

3. The Board of Elections must lower the signature requirement for the named plaintiffs running as candidates for U.S. President and Vice President to 50 percent of the total petition signatures required by Virginia Code § 24.2-543(A).

In all other respects, the Court declines to enjoin enforcement of Virginia's signature requirements.

## I. FINDINGS OF FACT[1]

### *A. Virginia's Signature Requirements*

In Virginia, independent or minor party candidates seeking national office must collect a certain number of signatures to appear on the general election ballot. An independent or minor

---

[1] After a bench trial, "the court must find the facts specifically and state its conclusions of law separately." Fed. R. Civ. P. 52(a)(1). The Court summarizes the facts based on trial testimony and evidence introduced during the July 13 bench trial. In light of the upcoming petition signature deadline, however, the Court issues this Opinion and Order on an expedited basis. Accordingly, the Court will not cite to a trial transcript when summarizing testimony because that transcript is not yet available.

2

party candidate for the U.S. Senate must obtain 10,000 signatures, with signatures from at least 400 qualified voters from each Virginia congressional district. *See* Va. Code. Ann. § 24.2-506(A)(1). An independent or minor party candidate running for the U.S. House of Representatives must obtain 1,000 signatures from the congressional district. *Id.* § 24.2-506(A)(2). An independent or minor party candidate running for President or Vice President must collect 5,000 signatures, with signatures from at least 200 qualified voters from each congressional district. *Id.* § 24.2-543(A).

Candidates may begin collecting signatures on January 1. *Id.* §§ 24.2-506(A), 24.2-543. To appear on the 2020 general election ballot, independent and minor party candidates running for the U.S. Senate or U.S. House of Representatives must have submitted their signatures by June 9, 2020, at 7:00 p.m. *See id.* § 24.2-507. Independent or minor party candidates running for U.S. President or U.S. Vice President must submit their signatures by August 21, 2020, at noon. *See id.* § 24.2-543(A). A qualified person must witness all petition signatures. *Id.* §§ 24.2-506(A), 24.2-543(A). The Virginia Department of Elections validates the petition signatures. It may invalidate a petition if the petition does not comply with the requirements set forth in the Virginia Code. *See id.*

At trial, Christopher Piper, the Commissioner of the Virginia Department of Elections, testified about the petition signature validation process during a normal election year. Once a potential candidate submits his or her signatures, a Department of Elections employee manually checks the name, address, and partial social security number, if given, associated with each signature against the voter registration database to insure that it is a qualified voter's signature. At present, the Department of Elections—an office with approximately forty-seven employees—has three to four employees checking signatures. Closer to the deadline in presidential election years,

3

the office also brings in ten to fifteen individuals on a temporary basis to help with validating signatures.

The person signing a petition does not have to sign under penalty of perjury, and the person witnessing the signature does not need to confirm the identity and voter qualifications of the signing individual. The witness, however, must sign under penalty of perjury before a notary that he or she witnessed each person signing the petition. The witness signature requirement protects against voter fraud. In past elections, witnesses who have submitted false signatures have been charged with a felony.

The registrar of each Virginia locality prints and distributes the ballots, and ballot templates vary by locality. Before printing, the Department of Elections must first review and approve all ballots. The review, approval, and printing process takes several weeks.

This year, absentee ballot voting begins on September 18, 2020. Federal law requires the Department of Elections to mail absentee ballots forty-five days before the November general election. *See* 52 U.S.C. § 20302(a)(8). Thus, to insure timely mailing, the Department of Elections must have validated petition signatures, provided the local registrars with candidate names, and reviewed and approved all ballots with enough time for the registrars to have ballots printed by September 11, 2020. The Department of Elections, therefore, must receive all petition signatures by August 21, 2020, to insure that it has time to validate the signatures.

Further, because of the time the signature validation and ballot review and printing processes takes, the Department of Elections finishes validating congressional candidates' petition signatures before the deadline for presidential and vice presidential candidates' petition signatures. According to Piper, moving the congressional signature deadline to August 21, 2020, would require the Department of Elections to undertake a "monumental" effort to finalize the ballots by

4

the federal absentee ballot deadline. In light of COVID-19, Piper anticipates that more voters than usual will request absentee ballots. Moreover, Piper opines that eliminating the signature requirement entirely could result in a multi-page ballot.

### B. Virginia's Response to COVID-19

On March 12, 2020, Governor Northam declared a state of emergency in response to the outbreak of COVID-19. (Defs.' Ex. B.) On March 30, 2020, Governor Northam issued a stay-at-home order effective until June 10, 2020, which limited gatherings to no more than ten individuals and implemented measures to restrict person-to-person contact. (Defs.' Ex. D.)

Beginning on May 15, 2020, most of Virginia entered "Phase One," which eased the temporary restrictions, allowed some businesses to reopen with restrictions, and implemented "safer at home" guidelines such as continued physical distancing and teleworking. (Defs.' Ex. E.) On June 5, 2020, most of Virginia entered "Phase Two," which continued physical distancing and teleworking guidelines but permitted social gatherings of up to fifty people and allowed restaurants and beverage establishments to offer indoor dining at 50 percent occupancy. (Defs.' Ex. F.) On July 1, 2020, Virginia moved into "Phase Three," which continued physical distancing guidelines but increased social gathering sizes to 250 people. (Defs.' Ex. G.) Further, restaurants and beverage establishments may now return to 100 percent occupancy as long as they can observe physical distancing, and entertainment venues may allow up to 1,000 people. (*Id.*)[2]

### C. The Plaintiffs' Signature Collection Efforts

The complaint names fifteen candidates from four independent or minor parties seeking national office—three presidential candidates, one vice presidential candidate, one candidate for

---

[2] Hereinafter, the Court will refer to these orders as the "Executive Orders."

the U.S. Senate, and ten candidates for the U.S. House of Representatives.[3] The parties' candidates normally collect more than the required number of signatures to account for potentially invalid signatures. Representatives of the Libertarian Party of Virginia, Green Party of Virginia, and Constitution Party of Virginia testified at trial.

Typically, the parties rely on "boots-on-the-ground" efforts to gather signatures. For example, they collect signatures at large public gatherings during the spring and summer, outside the Virginia Department of Motor Vehicles ("DMV"), outside grocery and department stores, through door-to-door canvassing, and at polling places during primary elections. Since COVID-19 began and Governor Northam issued the Executive Orders, nearly all large public gatherings have been cancelled. The DMV and many private businesses no longer allow the plaintiffs to collect signatures or set up a table on their properties. At least two of the parties either have used or are considering using a paid petition circulator, but the petition circulator has expressed concerns about putting his and others' health at risk.

The Libertarian Party of Virginia, which has had a presidential candidate on the ballot every election cycle since 1988, began collecting signatures in January. It ceased its collection efforts on March 27, 2020, based on COVID-19 and the Executive Orders. At that point, the Libertarian Party had collected approximately 1,300 signatures. In April, the party sent two letters to the Commonwealth of Virginia asking for relief from the signature requirement. It did not receive the requested relief. By April, the Libertarian Party learned that other groups were seeking judicial relief from Virginia's signature requirements.

---

[3] The Court entered a partial consent decree as to one named plaintiff, so the Court does not include him here.

6

On June 21, 2020, the Libertarian Party resumed limited signature collection efforts at locations that will allow its members to table while maintaining physical distancing requirements. Petition circulators will direct people to a clip board while standing six feet away. Physical distancing requirements limit the petition circulators' abilities to show people where and how to sign the petitions. The Libertarian Party also has a page on its website where those who wish to sign a petition can contact the party. If a volunteer in the area is available, he or she will go to the interested person to collect the signature. But even with these efforts, petition circulators are reluctant to gather signatures due to health concerns. Those who do try to gather signatures have a difficult time getting the same number they would expect in a normal election year. At last count, the Libertarian Party had collected just over 2,000 signatures.

The Green Party of Virginia also stopped its signature collection efforts in March, 2020. Its members did not collect many signatures before that point because the Green Party gathers 99 percent of its signatures later in the year. In late March, 2020, the Green Party of Virginia was involved in writing a letter to Governor Northam requesting relief from the signature requirement in light of COVID-19. The Green Party learned that other groups were seeking judicial relief from Virginia's signature requirements in late April or early May. Currently, the Green Party of Virginia has collected less than 1,000 signatures. It has just selected its presidential candidate, who will coordinate using paid petition circulators.

The Constitution Party of Virginia planned to begin signature collection efforts for its presidential candidate on April 1, 2020. The Constitution Party prefers to collect signatures through door-to-door canvassing. In light of Governor Northam's stay-at-home order, the Constitution Party has not tried to gather signatures and will not let its members gather signatures for its candidate.

7

### *C. This Lawsuit*

On May 15, 2020, the plaintiffs sued the defendants pursuant to 42 U.S.C. § 1983, alleging violations of their First and Fourteenth Amendment rights. On June 5, 2020, the plaintiffs filed an amended complaint, which added plaintiffs but did not otherwise significantly alter the allegations in the complaint. The plaintiffs ask the Court to declare Virginia's signature requirements unconstitutional as applied to the plaintiffs in this election cycle, to enjoin enforcement of the signature requirements, and "[t]o grant such other and further relief as the Court deems just and proper." (Am. Compl., at 17.)

On June 8, 2020, the plaintiffs filed a motion for a temporary restraining order ("TRO") or preliminary injunction ("PI") and served the defendants with a copy of the motion and the complaint. On June 19, 2020, the Court heard argument on the motion. After a break, the parties indicated that they had resolved the case. Thus, the Court declined to rule on the motion. Instead, it set the case for an expedited bench trial in the event that the parties did not execute the settlement agreement. *See* Fed. R. Civ. P. 65(a)(2). After the parties failed to settle the claims of all but one plaintiff, the case proceeded to trial on July 13, 2020.

At trial, the plaintiffs clarified that they seek an injunction ordering the following: (1) an extension until August 1, 2020, for congressional candidates to submit signatures; (2) that Virginia accept 25 percent of the total signatures required for all candidates, if no digital signatures are allowed; and (3) alternatively, that Virginia accept 35 to 40 percent of the total signatures required for all candidates, if digital signatures are allowed. The defendants concede that COVID-19 has created unique challenges and thus does not oppose most of the relief the plaintiffs request. The defendants, however, ask the Court to reduce the signature requirements for congressional

8

candidates to 35 percent of the total signatures required, and for presidential and vice presidential candidates to no less than 60 to 80 percent of the total signatures required.

## II. CONCLUSIONS OF LAW

### *A. Anderson-Burdick Analysis*

The plaintiffs have made an as-applied challenge, arguing that Virginia's signature requirements are unconstitutional as applied to them in light of COVID-19 and the Executive Orders. Accordingly, the Court must first decide the level of scrutiny that applies to its analysis.

As explained in the Court's July 10, 2020 Memorandum Order, issues regarding ballot access implicate "the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." *Anderson v. Celebrezze*, 460 U.S. 780, 787 (1983). "The right to vote is heavily burdened if that vote may be cast only for major-party candidates at a time when other parties or other candidates are clamoring for a place on the ballot." *Id.* (quotations omitted). Thus, excluding candidates from the ballot burdens voters' freedom of association because it hinders their ability to express views on various issues. *Id.* at 787-88. Nevertheless, states have an important interest in regulating their elections. *Id.* at 788.

Accordingly, to resolve a challenge to a state election law, a court "must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate." *Id.* at 789. A court must then "identify and evaluate" the interests the state puts forth to justify the burden the regulation imposes. *Id.* The court must determine the legitimacy and strength of those interests and the extent to which those interests "make it necessary to burden the plaintiff's rights." *Id.* Only after a court has made those determinations may it decide whether the challenged provision is unconstitutional. *Id.*

9

Courts apply a flexible standard when considering a challenge to a state's election law. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992). Thus, a court must consider "the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." *Id.* When a law severely restricts those rights, the state must narrowly tailor the law to advance a compelling state interest. *See id.* When the law "imposes only reasonable, nondiscriminatory restrictions upon the First and Fourteenth Amendment rights of voters," the state's interests in regulating elections generally justify the restrictions. *Id.* (quotations omitted).

At present, the signature requirements severely burden the plaintiffs' rights. The plaintiffs testified that they cannot gather signatures using normal methods. The large public gatherings on which they typically rely to obtain most signatures have been cancelled. Door-to-door signature gathering presents more difficulties because the plaintiffs cannot pass clip boards with petitions to those who answer the door. The DMV will not allow petition circulators to gather signatures during COVID-19. Approaching voters at polling places is less successful with more people voting absentee. Many stores either have physical barricades preventing the plaintiffs from setting up tables or will not give them permission to gather signatures on the stores' premises.

These difficulties—a result of COVID-19 and the Executive Orders—prevent the plaintiffs from meeting the signature requirements, thereby interfering with their ballot access. Indeed, other courts faced with challenges to signature requirements during COVID-19 have likewise concluded that such requirements impose a severe burden on plaintiffs.[4]

---

[4] *See, e.g.*, *Garbett v. Herbert*, 2:20-cv-245-RJS, 2020 WL 2064101, at *6-12 (D. Utah Apr. 29, 2020); *Esshaki v. Whitmer*, No. 2:20-CV-10831-TGB, 2020 WL 1910154, at *4-6 (E.D. Mich. Apr. 20, 2020), *stay granted in part*, No. 20-1336, 2020 WL 2185553 (6th Cir. May 5, 2020).

But the Court cannot ignore the important interests advanced by the defendants—protecting the integrity of Virginia's elections by preventing voter fraud and confusion, insuring that truly serious candidates appear on the ballot, and providing the Department enough time to prepare and distribute the general election ballots. Indeed, the Supreme Court has long recognized that, "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Anderson*, 460 U.S. at 788. Indeed, the "prevention of voter fraud has been recognized as a compelling state interest." *Curtin v. Va. State Bd. of Elections*, No. 1:20-cv-00546-RDA-IDD, 2020 WL 2817052, at *4 (E.D. Va. May 29, 2020).

The signature requirements advance a compelling state interest. First, the signature requirements show that the candidate has a "modicum of support" before appearing on the ballot. *Buscemi v. Bell*, No. 19-2355, 2020 WL 3634740, at *7 (4th Cir. July 6, 2020) (published opinion). Second, requiring a witness to swear under penalty of perjury that each individual signed the petition prevents people from submitting false signatures without consequence, protecting against voter fraud. Third, the signature deadlines provide the defendants with enough time to insure that the ballots accurately reflect all qualified candidates while enabling the defendants to complete their responsibilities within the time period required by federal law.

Nevertheless, the signature requirements as set forth in the Virginia Code are not narrowly tailored to justify the interests put forth by the defendants in the current circumstances. *Cf. Libertarian Party of Ill. v. Pritzker*, No. 20-cv-2112, 2020 WL 1951687, at *4 (N.D. Ill. Apr. 23, 2020) ("The combined effects of the restrictions on public gatherings imposed by Illinois' stay-at-home order and the usual in-person signature requirements in the Illinois Election Code is a nearly insurmountable hurdle for new party and independent candidates attempting to have their names

11

placed on the general election ballot."). The existing requirements—in the current environment—make it almost impossible for the plaintiffs to get on the ballot. Indeed, at trial, the defendants recognized this problem and proposed more narrow means by which they can protect their interests. Accordingly, the signature requirements as applied to the plaintiffs in light of COVID-19 and the Executive Orders do not survive strict scrutiny. The Court will next consider what relief is appropriate in this case.

### B. Injunction Factors

A plaintiff seeking a permanent injunction must demonstrate: "(1) that [he or she] has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156–57 (2010).

First, the plaintiffs will suffer an irreparable injury if they are denied a meaningful opportunity to appear on the general election ballot. Elections are unique by nature. Although an unsuccessful candidate can run again, he or she can never regain the opportunity to seek election for a particular office during that election cycle. Moreover, COVID-19 spreads easily, and "no current vaccine or known treatment options exist at this time." (Defs.' Ex. C, at 1.) COVID-19, therefore, presents serious health risks to those circulating, witnessing, signing, and notarizing petitions. For those same reasons, only a prospective remedy can adequately redress this injury.

As for prong three, the current circumstances justify "a remedy in equity." *Id.* The defendants appear to agree—and the Court concurs—that reducing the signature requirement to

12

35 percent for congressional candidates is appropriate.[5] Piper also admits that extending the signature deadline for those candidates to August 1, 2020, is reasonable. The Court, therefore, will modify the signature requirements for the named plaintiffs running for the U.S. Senate and U.S. House of Representatives accordingly.

As for presidential and vice presidential candidates, the defendants concede that the balance of hardships warrants some reduction in the signature requirement. The Court, however, concludes that the defendants' proposal of requiring 60 to 80 percent of the signatures falls short. Although Governor Northam has eased restrictions and more than a month remains before the August 21 deadline, the unpredictable nature of COVID-19 coupled with the Phase Three restrictions continue to hinder the plaintiffs' abilities to fully resume their signature gathering efforts. *Cf. Garbett*, 2020 WL 2064101, at *14 ("The COVID-19 crisis and the State's emergency response significantly depressed candidates' ability to demonstrate a modicum of support and the voters' ability to express their support.") Phase Three allows for larger gatherings but still requires physical distancing and mandates that businesses that cannot adhere to strict physical distancing and other requirements close. (*See* Defs.' Ex. G.) Thus, the plaintiffs will continue to encounter significant obstacles with collecting signatures even under the eased restrictions. *Cf. Esshaki*, 2020 WL 1910154, at *6 ("The reality on the ground for Plaintiff and other candidates is that state action has pulled the rug out from under their ability to collect signatures.").

The Court, however, finds the plaintiffs' request for a 75 percent reduction in required signatures equally unreasonable.[6] Counsel for the plaintiffs argues that, when the plaintiffs have

---

[5] For the reasons set forth below, the Court finds a reduction to 25 percent of the total signatures unreasonable.

[6] The doctrine of laches bars the plaintiffs' request that the defendants accept digital signatures. Laches requires proof of two elements: "(1) lack of diligence by the party against

13

collected signatures since Governor Northam's stay-at-home order went into effect, the plaintiffs have collected approximately 25 percent of the number of signatures they would normally expect to collect. But the defendants' argument regarding the eased restrictions applies with more force here. As businesses begin to reopen and people start to gather in larger groups, the plaintiffs have not demonstrated that they will not begin to have more success gathering signatures. Thus, the plaintiffs' proposed remedy does not adequately account for the defendants' interest in demonstrating an appropriate and verifiable level of support before placing that candidate on the ballot in light of the eased restrictions. *See Garbett*, 2020 WL 2064101, at *17 ("Garbett's first request for [the Court to order the Lieutenant Governor to place her on the Republican primary ballot] goes too far. The State has an important interest in ensuring candidates demonstrate a modicum of voter support before securing a place on the ballot."); *cf. Buscemi*, 2020 WL 3634740, at *7.

---

whom the defense is asserted, and (2) prejudice to the party asserting the defense." *Perry v. Judd*, 471 F. App'x 219, 224 (4th Cir. 2012). To prove a lack of diligence, the moving party must have "delayed inexcusably or unreasonably in filing suit." *Id.* Here, despite knowing about numerous other lawsuits filed throughout March, April, and May, the plaintiffs waited until May 15, 2020, to file this case. Moreover, they waited almost a month—on the eve of the first signature deadline—to serve the defendants with the complaint and to seek emergency relief. The plaintiffs have proffered no reasonable reason for waiting to file suit until mid-May or for waiting nearly one month to notify the defendants of this lawsuit and seek emergency relief. *Cf. Curtin*, 2020 WL 2817052, at *5. Thus, the plaintiffs did not act diligently. Additionally, the defendants will suffer prejudice if the Court requires them to add a new element to the signature verification process in the middle of a global pandemic, weeks before they must finalize, approve, and print the ballots. *See Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) ("This Court has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election."); *cf. Curtin*, 2020 WL 2817052, at *5 ("Stated succinctly, granting the relief Plaintiffs seek has, at this point, become impractical and likely ineffectual in light of the rapidly approaching June 16, 2020, deadline for filing applications to vote by absentee ballot.").

Rather, the Court will reduce the signature requirement for presidential and vice presidential candidates by 50 percent. *Cf. Faulkner v. Va. Dep't of Elections*, 140 Ca. Cir. 373, 376 (2020) (reducing the signatures required in March, 2020, for a Republican candidate for U.S. Senate from 10,000 to 3,500). This reduction not only balances the hardships of the parties but also serves the public interest. Reducing the number of signatures limits the amount of contact the petition circulators must have with the public to satisfy the signature requirements while preserving the voters' First Amendment rights to associate and express their political views. *See Esshaki*, 2020 WL 1910154, at *9. This relief also helps insure that the obstacles arising from the combined effects of COVID-19 and the Executive Orders do not unduly "limit the field of candidates from which voters might choose." *Anderson*, 460 U.S. at 786. On the other hand, requiring that candidates collect a more substantial portion of the signatures enables the defendants to insure that Virginia's 2020 general election is "fair and honest and [in] some sort of order, rather than chaos." *Id.* at 788.

To some extent, a degree of arbitrariness creeps into selecting a deadline for completion of any task, or picking a numerical standard for successful completion of a task. One can rationally argue, for instance, that a basketball game need only last thirty minutes to reflect the skills of the teams, or that a three-point basket should be worth four points. And in this case, the parties have reasons for longer or shorter petitioning periods, and greater or lesser numbers of signatures. The Court finds, however, that the requirements imposed today roughly balance the plaintiffs' need to support their candidates with the Commonwealth's need to have a fair and honest election.

### III. <u>CONCLUSION</u>

For the foregoing reasons, the Court concludes that the signature requirements for the U.S. House of Representatives, U.S. Senate, U.S. Vice President, and U.S. President set forth in the

15

Virginia Code, Va. Code. Ann. §§ 24.2-506, 24.2-543, fail strict scrutiny in this case. The Court, therefore, will enjoin the defendants from enforcing the signature requirements as applied to the plaintiffs for the November, 2020 general election in Virginia. The Court will extend the deadline for candidates for the U.S. House of Representatives and U.S. Senate to August 1, 2020, at 7:00 p.m. *See id.* § 24.2-507. Those candidates need only submit 35 percent of the total signatures required by Virginia Code § 24.2-506(A)(1), (2). The Court will require candidates for U.S. President and U.S. Vice President to submit 50 percent of the total signatures required by Virginia Code § 24.2-543(A). In all other respects, the Court declines to modify the signature requirements set forth by Virginia law.

Importantly, the Court limits this ruling only to the named plaintiffs seeking to appear as candidates for the U.S. House of Representatives, U.S. Senate, U.S. Vice President, and U.S. President on the November, 2020 general election ballot in Virginia. The Court takes no position on the constitutionality of Virginia's signature requirements as applied to other individuals on a different factual record or during a different election.

The Court will issue an appropriate Order.

Let the Clerk send a copy of this Opinion to all counsel of record.

Date: 15 July 2020
Richmond, VA

/s/
John A. Gibney, Jr.
United States District Judge